*Prince George's County Council, et al. v. Concerned Citizens of Prince George's County, et al.*, No. 23, September Term, 2022.  Opinion by Gould, J.

**LAND USE – ZONING – STANDARD OF REVIEW**

Maryland courts review amendments to the text of a zoning ordinance as legislative actions.  *Md. Overpak Corp. v. Mayor of Balt.*, 395 Md. 16, 35 (2006); *MBC Realty, LLC v. Mayor of Balt.*, 192 Md. App. 218, 234 (2010).  In Prince George's County, amendments to the zoning ordinance are considered "final decision[s]" of the Prince George's County Council, sitting as the District Council, and are reviewed by courts only for legality.  *See* Md. Code Ann., Land Use § 22-407(a)(1), (e) (2012, 2022 Supp.); *Town of Upper Marlboro v. Prince George's Cnty. Council*, 480 Md. 167, 180-81, 191 (2022); *Cnty. Council of Prince George's Cnty. v. Chaney Enters. Ltd. P'ship*, 454 Md. 514, 528-31 (2017).

**LAND USE – ZONING – UNIFORMITY**

In uniformity challenges to zoning regulations, Maryland courts evaluate whether the regulation is "reasonable and based upon the public policy to be served."  *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 720 (1977).  The Supreme Court of Maryland has held that "[t]he crux of the [uniformity] requirement is only that similarly situated properties are treated the same under the zoning regulations," observing that "the kind of discrimination violative of the uniformity requirement occurs when a zoning ordinance singles out a property or properties for different treatment than others similarly situated."  *Anderson House*, *LLC v. Mayor of Rockville*, 402 Md. 689, 714-15 (2008).

**LAND USE – ZONING – UNIFORMITY**

The Supreme Court of Maryland upheld an amendment to a Prince George's County zoning ordinance that allowed qualifying properties in the Residential-Agricultural Zone to develop higher-density housing.  Even though the amendment's text and history showed that the Council knew that only one particular property would likely qualify, the amendment was valid because it furthered a valid public purpose and did not discriminate between similarly situated properties.

Circuit Court for Anne Arundel County
Case No. C-02-CV-20-001850
Argued: February 3, 2023

IN THE SUPREME COURT

OF MARYLAND*

No. 23

September Term, 2022

_____

PRINCE GEORGE'S COUNTY
COUNCIL, et al.

v.

CONCERNED CITIZENS OF PRINCE
GEORGE'S COUNTY, et al.

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Getty, Joseph M. (Senior Justice,
    Specially Assigned)

JJ.

_____

Opinion by Gould, J.
Fader, C.J., Watts, and Booth, JJ., dissent.
_____

Filed: August 22, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

This zoning dispute involves the interplay between the public's interest in the future of a small, struggling private airport in Prince George's County and the financial interests of its owner.

The airport lies in an area that was once rural and is now largely suburban. Over the past forty years or so, a few dozen small planes have crashed during takeoff or landing. Some of those planes have crashed into nearby residences or the highway that runs next to the airport, sometimes fatally. Since at least the 1990s, the county has identified the airport as a public safety risk.

The airport has experienced financial difficulties in recent years. As a result, its owners have said they will increase operations or, alternatively, redevelop the site for non-airport use. The county's zoning ordinance has historically limited development of housing at the airport to low-density, single-family detached housing. To incentivize redevelopment of the airport, the County Council, over the protests of some constituents, amended the text of the zoning ordinance to allow the airport to develop higher-density housing, including townhouses.

Those constituents challenged the legality of that ordinance in court, claiming that it violated Maryland's uniformity requirement, which requires zoning laws to "be uniform for each class or kind of development throughout a district or zone." Md. Code Ann., Land Use ("LU") § 22-201(b)(2)(i) (2012, 2022 Supp.).[1] They argued that the ordinance, though facially neutral, violates uniformity because it is tailored so narrowly as to afford favorable

_____

[1] The cited statute applies to Prince George's County. Maryland's uniformity law applicable elsewhere in the State is functionally identical. *See* LU § 4-201(b)(2).

development opportunities, in effect, to only the airport property. The circuit court rejected their challenge, but the Appellate Court of Maryland[2] reversed, finding that the ordinance violated the uniformity requirement.

We find that, notwithstanding the financial benefits the airport's owners and developers may enjoy, the ordinance was adopted to further a valid public purpose and does not discriminate against similarly situated properties; therefore, it should have survived the uniformity challenge. Accordingly, we reverse the judgment of the Appellate Court.

## BACKGROUND

In November 2019, the Prince George's County Council, sitting as the District Council (the "Council"),[3] enacted Council Bill 17-2019 ("CB-17" or "Council Bill 17"), a text amendment to the Prince George's County Code, to encourage the decommissioning of the Freeway airport by allowing higher-density housing. Under the county zoning ordinance then in effect (the "Old Zoning Ordinance" or "PGCC § 27-"), the airport was zoned as Residential-Agricultural ("R-A"). The R-A Zone prohibited single-family attached residences ("townhouses") and imposed a maximum development density of 0.5 dwelling units per acre. PGCC §§ 27-441(b), 27-442(h).

---

[2] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

[3] The Council is the ultimate local legislative authority over zoning laws and maps within Prince George's County. LU § 22-104.

Council Bill 17, however, exempts qualifying R-A Zone properties, namely the Freeway airport, from those limitations, allowing townhouses and a development density of up to 4.5 dwelling units per acre. PGCC § 27-441(b) n.136.[4] Specifically, CB-17 allows for higher-density housing[5] if located on an assemblage of adjacent properties that: (1) is 100-150 acres *or* was formerly used as an airport; (2) is entirely within one mile of a municipal boundary; (3) is entirely within 2,500 feet of land used for the generation, transmission, or distribution of electricity; and (4) has frontage on a freeway. *Id.*

### The Freeway Airport and Environs

The Freeway airport is a privately-owned general aviation airport on a 129-acre property at 3900 Church Road in Bowie. The Rodenhauser family has owned and operated the airport since it began as an airfield in the 1930s, when the area was rural. In 1947, the airport opened for general aviation and has operated as an airport ever since. In 1968, the property was included in the R-A Zone. Because the R-A Zone does not allow for airports,[6] the property obtained legal nonconforming use status.[7]

---

[4] The cited footnote appears throughout the record variously as Footnote 134 and Footnote 135. The current version of the zoning ordinance codifies the text amendment as Footnote 136. PRINCE GEORGE'S COUNTY, MD., MUN. CODE (2022 Supp., Update 3), (codified through Bill No. CB-104-2022, effective Dec. 27, 2022).

[5] We refer to the allowance of townhouse construction and a development density of up to 4.5 dwelling units per acre collectively as "higher-density housing."

[6] The R-A Zone allows special exceptions for private airstrips, which are much smaller and limited in their operations. PGCC §§ 27-441(b), 27-445.07.

[7] Nonconforming uses are lawful uses that do not conform to zoning regulations, typically because they predate the enactment of a new zoning ordinance. *Trip Assocs., Inc. v. Mayor of Balt.*, 392 Md. 563, 573 (2006). A nonconforming use may be permitted to

Today, the airport is largely surrounded by suburban residential communities, developed mostly in the last two decades, containing hundreds, if not thousands, of homes. Waterford Estates is directly west of the airport, containing hundreds of single-family detached homes; Fairwood lies to the north and has approximately 1,700 residences, including townhouses; Fairview Manor sits to the east; and Woodmore Highlands is to the southeast. The Woodmore golf course community, directly west of Waterford Estates and approximately one-half mile from the Freeway airport, contains 259 townhouses. That community was developed under a 2008 amendment to the zoning ordinance allowing townhouses on certain R-A Zone properties, up to a density of 0.5 dwelling units per acre. PGCC § 27-444(b)(6).

Route 50, an interstate highway with four lanes in each direction, abuts the north end of the airport's only runway. Along the property's western edge, high-voltage electric transmission lines installed in the 1960s run approximately one thousand feet from, and parallel to, the runway. The transmission lines, in addition to presenting aviation obstacles, reduce the space available for emergency landings. The eastern boundary of the property runs along Church Road, a county road with one lane in each direction.

In the mid-1990s, the Small Airports Advisory Committee—which included Councilmember Derrick Leon Davis, the sponsor of CB-17—studied the various airports in Prince George's County in an effort to promote safe development near the Freeway airport. The committee was especially concerned with the risk of, and damage from, planes

---

continue if a property owner can show the use was lawful at the time the new zoning ordinance was enacted. LU § 22-114.

4

crashing during takeoff and landing. Subsequent development of the Fairwood community, located just north of the airport, incorporated lessons from that study. Specifically, the Council enacted regulations limiting development density in areas where planes were more likely to crash.

Since 1983, 32 accidents have been documented at the Freeway airport, resulting in 10 fatalities. In some cases, planes have landed directly on or close to Route 50, colliding with traffic in at least one instance. On September 12, 2019, while CB-17 was under consideration by the Council, a plane from the airport crashed into Route 50, striking a car and injuring multiple people. At least twice, planes have crashed into or very close to homes, sometimes fatally.

### *The Enactment of CB-17-2019*

Councilmember Davis introduced CB-17 on April 30, 2019, to amend the Table of Uses under the Old Zoning Ordinance for the stated purpose "of permitting Townhouse and One-family detached dwelling uses in the R-A (Residential Agricultural) Zones of Prince George's County, under certain circumstances." CNTY. COUNCIL OF PRINCE GEORGE'S CNTY., MD., SITTING AS THE DIST. COUNCIL, CB-17-2019, 2019 Leg. (2019).

The first draft of the bill would have permitted development of townhouses up to 6.0 dwelling units per acre and single-family detached homes up to 6.7 dwelling units per acre in the R-A Zone if the assemblage of land: (1) was no more than 140 acres; (2) was formerly used, entirely or in part, as an airport; (3) was located within one mile of a municipal boundary; and (4) had frontage on a public right-of way classified as an arterial

5

or higher by the State. Despite the facially neutral language of the bill, CB-17 specifically sought to incentivize the decommissioning of the Freeway airport.

Two days later, the Prince George's County Planning Board (the "Planning Board") held a hearing on the bill. The Planning Board is a five-member body responsible for local planning, subdivision, and zoning. LU § 20-202(a)(i). Proposed amendments to the zoning ordinance must be sent to the Planning Board for comments and recommendations. PGCC § 27-217. At the hearing, when a board member asked Robert Antonetti, counsel for Freeway Airport, LLC,[8] why Freeway Airport did not instead apply to rezone the property, Antonetti said he expected a text amendment would be a faster and more direct process.

The same day, the Planning Board issued a report to the Council opposing CB-17. The Planning Board argued that townhouses were not appropriate for the R-A Zone, the stated purposes of which are "to provide for large-lot one-family detached residential subdivisions, while encouraging the retention of agriculture as a primary land use[,]" and to "encourage the preservation of trees and open spaces[.]" PGCC § 27-426(a).

The Planning Board determined that, without the "former airport" requirement, approximately 262 properties would meet the criteria of the bill. With the "former airport" requirement, however, only the Freeway airport would qualify, as the three other operational airports in the county were not zoned R-A. The Planning Board added that it "believe[d] this bill was drafted for a specific property"—the Freeway airport. The Prince

---

[8] Freeway Airport, LLC, a partnership between the Rodenhauser family and St. John Properties, Inc., is the contract purchaser of the Freeway airport property. For clarity, we refer to petitioner Freeway Airport, LLC, as "Freeway Airport" and the Freeway airport property as "the Freeway airport" or "the airport."

6

George's County Office of Law ("Office of Law") agreed, writing in a one-sentence memorandum that "[t]he bill may be subject to challenge as it appears to be drafted for a specific parcel." Neither the Planning Board nor the Office of Law expressly raised the prospect of a uniformity violation.

Before CB-17 was sent to the Council, the Planning, Housing, and Economic Development Committee of the Prince George's County Council (the "Planning Committee") considered CB-17 in a hearing on June 20. In advance, Councilmember Davis had asked Karen Zavakos, Legislative Officer for the Planning Committee, to draft amendments to the bill ("Draft 2") "[i]n the interest of tempering the concerns raised by [the] Planning Board[.]" In response to concerns that the "formerly used as an airport language . . . may have been too specific," Draft 2 made the bill "more facially neutral." As relevant here, Draft 2 eliminated the "former airport" language; increased the maximum area from 140 to 150 acres; required the assemblage to be within 2,500 feet of land used for electrical generation, transmission, or distribution; and changed the requirement of proximity to an arterial right-of-way to proximity to a freeway.

Discussion at the Planning Committee hearing was dedicated to the Freeway airport. "Council Member Davis, the bill sponsor, informed the Committee that CB-17-2019 is intended to facilitate an idea for a development opportunity on property in his district where growth in the surrounding area of a small airport has occurred." CNTY. COUNCIL OF PRINCE GEORGE'S CNTY., MD., PLANNING, HOUSING, AND ECONOMIC DEVELOPMENT COMMITTEE REPORT, 2019 Leg., 1 (2019). Various constituents testified. Most opposed CB-17, expressing concerns about traffic safety on Church Road, increased burdens on public

7

resources like infrastructure and schools, and changes to the character of the area. A few residents, however, testified in support of CB-17, citing the unsuitability of the airport to the area, the undesirability of expanded airport operations there, and opportunities for economic development.

Kim Rodenhauser, whose family owns the Freeway airport, read a prepared statement. She described the financial challenges of the business and said that CB-17 would allow her family to redevelop the property rather than expand airport operations, which the Rodenhausers believed would otherwise be necessary to stay in business. She was forthright about the family's financial interest in CB-17, saying, "This legislation would benefit our family . . . we have a vested interest in the future of the property[.]" The statement also described when, in 1998, an airplane crashed into the Rodenhausers' home, killing one person. Antonetti testified about the history of aviation accidents at the airport and the risk presented by the nearby transmission lines, adding that "this bill would absolutely motivate the permanent closure of this airport." He also argued that the site was well-suited for townhouses because it was located near existing housing development, a freeway, and electricity transmission, and had already been cleared.

Councilmember Thomas Dernoga suggested reducing the maximum distance from electrical infrastructure from 2,500 feet to 2,000 feet to ensure that no properties other than the Freeway airport would qualify. This suggestion, however, was ultimately not proposed as an amendment. The Planning Committee adopted the amendments proposed by Councilmember Davis, further revised the acreage requirement to include a minimum of 100 acres, and voted to advance Draft 2 to the Council.

The Council held a hearing on September 10. Public comment largely tracked the testimony at the Planning Committee hearing, with most opposing CB-17. Councilmember Colin Byrd of the Greenbelt City Council expressed concern that, even though the bill targeted the Freeway airport, it "could allow other properties in the County to do similar things." One constituent alleged that the proposed developer, St. John Properties, Inc., had misled residents into submitting letters supporting the closure of the airport.

Others testified in support. Members of the Prince George's County Chamber of Commerce called the use of the site as an airport "unsustainable" and contended that CB-17 would create jobs, expand the tax base, and encourage development of nearby retail and entertainment. Tom Williams, a longtime employee and instructor at the Freeway airport, described his unease flying so close to housing developments. Antonetti also introduced maps into the record showing the 32 documented accidents since 1983.

Councilmember Davis described his participation in the County's past efforts to reduce public safety risks arising from the airport's proximity to housing developments, namely Fairwood. He also rejected accusations made by certain constituents that councilmembers had been paid by private interests to support CB-17.

The Council considered further amendments ("Draft 3") on October 8, 2019. The principal amendment, proposed by Councilmember Davis, reintroduced the "formerly used as an airport" language—no longer, however, as an absolute requirement but as an alternative to the acreage requirement. The record does not reveal why the former airport use language was reintroduced. When Councilmember Davis was asked if the language was necessary, given that the Freeway airport already satisfied the acreage requirement, he

9

replied affirmatively but without explanation. Another amendment reduced the maximum development density to 4.5 dwelling units per acre. The Council approved the amendments without explanation.

Before the next public hearing, Planning Board staff provided the Planning Board with a memorandum opposing CB-17, contending that townhouses were neither appropriate for the R-A Zone nor the successor Agricultural-Residential Zone ("AR") under the New Zoning Ordinance ("2022 PGCC § 27-"),[9] and that the bill appeared to have been drafted for a specific property. Two days later, the Planning Board submitted another report to the Council repeating its concerns and recommending that the property instead be rezoned to permit townhouses. The report noted that staff could not identify all properties meeting the criteria of Draft 3 because staff (1) lacked records of land "formerly used as an airport" and (2) could not determine what was meant by "assemblages of properties," which could potentially describe an "infinite" number of properties. The Planning Board,

---

[9] In October 2018, the District Council adopted a new zoning ordinance (the "New Zoning Ordinance"). The New Zoning Ordinance was set to take effect when the Council approved a countywide sectional map amendment, a process requiring the Council to apply the appropriate zoning classification in the New Zoning Ordinance to each parcel of real property in the County. CNTY. COUNCIL OF PRINCE GEORGE'S CNTY., MD., SITTING AS THE DIST. COUNCIL, CB-13-2018, 2018 Leg. (2018). The New Zoning Ordinance—both the zoning text and accompanying maps—ultimately took effect April 1, 2022. To distinguish citations to the Old Zoning Ordinance ("PGCC § 27-") from citations to the New Zoning Ordinance, references to the New Zoning Ordinance are identified as "2022 PGCC § 27-."

When the New Zoning Ordinance took effect, the Freeway airport was rezoned as Agricultural-Residential ("AR"), the successor to the R-A Zone under the Old Zoning Ordinance. The AR Zone, like its predecessor, prohibits townhouses as a principal use and provides for a maximum density of 0.5 dwellings units per acre. 2022 PGCC §§ 27-4201(d)(2), 27-5101(c).

10

however, noted that the Freeway airport would meet the criteria if its airport operations ceased.

The Office of Law also reviewed Draft 3, writing on November 13 that the bill "appear[ed] to be drafted for a specific parcel contained within an R-A zone" because only one parcel met the eligibility criteria for townhouse development. The Office of Law stated that "[i]f townhomes are permitted in the R-A zone, then the zoning regulations will not be uniform because townhomes are not detached, single family, nor on large lots." This statement marked the first direct appearance in the record of a uniformity concern. Notably, the Office of Law's concern apparently arose not because only the Freeway airport met the townhouse development requirements but because, as a general matter, allowing townhouse development conflicted with the purposes of the R-A Zone.

The Council held a public hearing on Draft 3 on November 19. Constituents presented similar arguments as those previously described. Antonetti contended that the bill was "not merely for private gain," citing the accident history at the Freeway airport and "the public safety benefit to closing a general aviation airport surrounded by residential development." The President of the Woodmore Homeowner's Association[10] expressed concern that a specific parcel in his community called "Hidden Pond" might qualify for higher-density housing under CB-17. This prompted the Council to amend the bill in a manner designed to exclude that parcel.

---

[10] The Woodmore Homeowner's Association represents homeowners from the Woodmore golf course community, not to be confused with Woodmore Highlands.

When it came time for the Council to vote on CB-17, Councilmember Deni Taveras explained her affirmative vote and encouraged other Councilmembers to do the same, saying:

> . . . I'll mention my experience with airport safety issues. And the irony is that the gentleman from St. John's does highlight seven crashes and nine, and ten fatal deaths that have occurred over the last several years and you are included. I remember. And what it remind —what that also reminds me of is that, on November 12, 2001, back where I'm from in New York, we had 265 people die in a plane crash, Flight 587, heading to Dominican Republic. I don't know if anybody remembers that, but it was shortly after 9/11. And I lost ten people, ten family members, on that plane crash, ones, family and friends. And, especially after 9/11, as a New Yorker, I was never the same, and neither was my family, and neither was the neighborhood. Especially if you live in [sic] an airport, none of that is ever the same.

> . . . [T]he alternative [to developing the Freeway airport] is that they're going to rebrand and they're going to reengage to have higher, increasing traffic. This is the risk that you take. And everybody feels that it's not them. They're never going to get hit. They're never— they'll survive.

> And so, the thing is, I just say there's nothing wrong with the outline of the development plan that's provided. With the same way we have Fairwood and some of these other higher-density, and Woodmore Highlands, some of these higher densities, they would look at— there's no difference with what's being proposed, which concerns me that why this area and not Fairwood and not these other places. Why is that okay? And I think that the lady says, if they were allowed, why can't this?

> And so, with that, I just want to say that, and there's already plans for an ice rink. There's already plans for a school site. There are already plans in place for future development that compensates and that accounts for the changes that are coming. So, with that, I just want to say go ahead and vote in favorable [sic] for this proposal.

12

The Council then approved the final version of CB-17, and CB-17 took effect 45 days later on January 3, 2020.  The enacted bill added Footnote 136[11] to the Table of Uses, permitting townhouses and single-family detached homes in the R-A Zone at up to 4.5 dwelling units per acre if:

> (a) The use is located on an assemblage of adjacent properties that:
>
>> (i) is no less than one hundred (100) acres and no more than one hundred fifty (150) acres in size or was formerly used as an airport;
>>
>> (ii) is entirely within one (1) mile of a municipal boundary;
>>
>> (iii) is entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation, transmission, or distribution in connection with providing public utility service in the County by a regulated public utility; and
>>
>> (iv) a portion of the boundary of the assemblage of adjacent properties has frontage on a public right--of--way classified as a freeway or higher in the Master Plan of Transportation and is maintained by the State Highway Administration.

PGCC § 27-441(b).

### *Procedural Background*

#### *Judicial Review in the Circuit Court*

Concerned Citizens of Prince George's County, et al. ("Concerned Citizens") petitioned for judicial review of CB-17 in the Circuit Court for Prince George's County on December 16, 2019.  In its supporting memorandum, Concerned Citizens presented five

---

[11] *See* text accompanying note 4, *supra*.

questions, including whether CB-17 violated the uniformity requirement.[12]  They argued, without reference to case law, that CB-17 "[o]n its face" violated uniformity by allowing a "very specific, very limited segment of the R-A zone"—the Freeway airport—to develop higher-density housing, in conflict with the stated purposes of the R-A Zone.

Citing *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686 (1977), Freeway Airport and the Council argued in a joint opposition memorandum that CB-17 did not violate uniformity because: (1) the text of the ordinance applied "uniformly to all qualifying properties using the same exact terminology of the regulation," even if it produced "vastly different results on different properties throughout the zone," and (2) CB-17 was "rooted in a sound public policy of protecting the citizens of Prince George's County" by encouraging the decommissioning of the Freeway airport. Concerned Citizens' reply memorandum focused on the alleged impropriety of using a text amendment to effect a "site-specific land use process," but did not elaborate upon the uniformity issue.

---

[12] Concerned Citizens presented the following questions before the circuit court:

(1) Was the District Council's enactment of CB-17-2019 an unlawfully granted zoning approval for the Freeway Airport property, when the statutory requirements for site-specific zoning actions were not met?;
(2) Did the District Council's enactment of CB-17-2019 constitute unlawful spot zoning?;
(3) Did the District Council's enactment of CB-17-2019 violate the uniformity requirement of the Regional District Act?;
(4) Did the District Council's enactment of CB-17-2019 violate the "special law" prohibition of Maryland's Constitution?; and
(5) Was CB-17-2019 enacted unlawfully in the absence of a required public hearing?

The matter was subsequently transferred to the Circuit Court for Anne Arundel County. At the hearing, Concerned Citizens' uniformity argument was limited to showing that CB-17 was narrowly drafted to target and benefit the Freeway airport. On May 7, 2021, the circuit court affirmed the Council's decision without explanation.

*Judicial Review in the Appellate Court*

On appeal to the Appellate Court of Maryland, Concerned Citizens raised substantially the same challenges as in the circuit court[13] and largely repeated their uniformity argument. In discussing *Woodward & Lothrop* for the first time, Concerned Citizens distinguished that case on the grounds that the regulations there were relatively broad and had an actual effect on numerous properties, in contrast to those in CB-17, which "were painstakingly specific to the Freeway Airport property." Concerned Citizens did not argue, however, that any criteria of CB-17 were unreasonable or not based on a public

---

[13] Those issues, as stated and numbered by the Appellate Court, were:

(1) Did the District Council's enactment of CB-17-2019 violate the uniformity requirement of Maryland Code, Land Use Article, Regional District Act?;

(2) Did the District Council's enactment of CB-17-2019 violate the "special law" prohibition of the Maryland Constitution?;

(3) Did the District Council's enactment of CB-17-2019 constitute unlawful "spot" zoning?;

(4) Was the District Council's enactment of CB-17-2019 an unlawful grant of relief to Freeway Airport from the use and density restrictions of the R-A zone without the required administrative, quasi-judicial procedure?; and

(5) May the District Council's enactment of CB-17-2019 be affirmed on the basis of "public interest" or "public benefit"?

*In re Concerned Citizens of PG Cnty. Dist. 4*, 255 Md. App. 106, 109-10 (2022).

purpose. Those issues arose only when the Appellate Court questioned Freeway Airport during oral argument, which led to a cursory and unrevealing discussion. Concerned Citizens did not contend that any other properties were unreasonably excluded from the development opportunities under CB-17.

The Appellate Court held that CB-17 violated Maryland's uniformity requirement. *In re Concerned Citizens of PG Cnty. Dist. 4*, 255 Md. App. 106 (2022). The Court reasoned that CB-17 was "tailor-made for Freeway Airport" and that the record did not show "any public purpose for creation of this special high-density area within an R-A zone[.]" *Id.* at 124. In effect, the Court deemed CB-17 a "mere favor" to Freeway Airport. *Id.* at 125-27. As evidence, the Court pointed to the provisions in CB-17 relating to former airport use and proximity to electrical infrastructure, finding that they lacked any discernible public purpose.[14] The Court did not reach the other issues on appeal.

*Petition for Certiorari and the Motion to Dismiss*

Freeway Airport and the Council each petitioned for writ of certiorari, asking this Court to reverse the Appellate Court and affirm the validity of CB-17. To complicate matters, after we granted writ of certiorari, *Prince George's Cnty. Council v. Concerned Citizens of Prince George's Cnty.*, 482 Md. 31 (2022), a newly elected Council enacted Council Bill 17-2023 ("CB-17-2023"), which took aim at CB-17 and the broader practice of enacting footnote exceptions to the Table of Uses in the Old Zoning Ordinance. CNTY.

---

[14] The Court did not take issue with the provisions requiring proximity to a municipality and a freeway. *Concerned Citizens*, 255 Md. App. at 125-26 & n.16. Concerned Citizens has not argued that those provisions are not reasonable and based upon public policy, except to the extent they target the Freeway airport.

16

COUNCIL OF PRINCE GEORGE'S CNTY., MD., SITTING AS THE DIST. COUNCIL, CB-17-2023, 2023 Leg. (2023).[15]  The Council subsequently filed a notice of dismissal, thereby withdrawing as a party and leaving Freeway Airport as the sole petitioner.  *See* Md. Rule 8-601(a).

Concerned Citizens moved to dismiss the case on the grounds that CB-17-2023 had repealed CB-17 and thus rendered the uniformity question moot.  *See* Md. Rule 8-602(c)(8).  "Generally, a case is moot if no controversy exists between the parties[.]" *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 351 (2019).  In land use and zoning cases, we generally presume that, absent contrary legislative intent, a substantive change in law occurring during litigation and before any substantive rights have vested is applied retroactively.  *McHale v. DCW Dutchship Island, LLC*, 415 Md. 145, 170 (2010).  Thus, if CB-17-2023 were to indeed preclude Freeway Airport from developing under CB-17, this controversy would be moot.

Freeway Airport, in opposing the motion to dismiss, contends that development of the airport can proceed under CB-17 despite the passage of CB-17-2023.  Freeway Airport argues that: (1) the New Zoning Ordinance allows, in certain cases, for development under the Old Zoning Ordinance, *see Concerned Citizens*, 255 Md. App. at 109 n.2; (2) CB-17-2023 prohibits development only under 2022 PGCC § 27-1903; and (3) CB-17-2023 does not prohibit Freeway Airport from developing the property under other

---

[15] Council Bill 17-2023 declared as its purposes: "limiting the authority in the Zoning Ordinance for development of Townhouse and One-family attached dwelling uses under the prior Ordinance in the R-A [] Zone" and "eliminat[ing] uses permitted in the prior Ordinance by way of Footnoted exceptions[.]"

sections, namely 2022 PGCC § 27-1704, which allows for development of certain "grandfathered" projects.

From the information in this record, we are unable to definitively determine that the case is moot. We shall, therefore, address the merits. The effect of our decision on the parties will be an issue for another day.

**ZONING AND THE STANDARD OF REVIEW**

Zoning authorities in Maryland implement land use plans and determinations of zoning categories primarily through three processes: original zoning, comprehensive rezoning, and piecemeal rezoning. *Mayor of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 532 (2002). Original zoning is the initial designation through legislative action, ordinarily by a local government, of large areas according to their permissible or prohibited uses and conditions. *Id.* at 532, 535. Comprehensive rezoning, as its name suggests, refers to the same process applied to areas previously zoned. *Id.* In contrast, piecemeal rezoning is a quasi-judicial action, culminating in a legislative act, relating to an individual parcel, lot, or assemblage, and is typically requested by a property owner. *Id.* at 532; *Anderson House, LLC v. Mayor of Rockville*, 402 Md. 689, 708 n.17 (2008).

The Council derives its zoning authority from the Maryland-Washington Regional District Act (the "RDA"). *Prince George's County v. Zimmer*, 444 Md. 490, 525-26, 523 n.29 (2015) (providing a history of the RDA); LU, Titles 14 to 27 (codifying the RDA). The RDA establishes the Maryland-Washington Regional District, which consists of nearly all of Montgomery and Prince George's counties, LU § 20-101, and grants primary zoning authority to the County Councils sitting as the District Councils, LU § 22-101.

18

The Council's zoning powers include "divid[ing] the portion of the regional district located within its county into districts and zones of any number, shape, or area it may determine."[16] LU § 22-201. The Council has authority to "adopt and amend the text of the zoning laws" and their accompanying maps to regulate, among other things: "the location, height, bulk, and size of each building or other structure"; "the density and distribution of population"; "the location and uses of buildings and structures"; and "the uses of land[.]" LU § 22-104; *see also* LU § 22-201(b)(1). Importantly, a text amendment is *not* a piecemeal rezoning, as it does not change the assigned zone of any parcel. *MBC Realty, LLC v. Mayor of Balt.*, 192 Md. App. 218, 238 (2010). Instead, it amends the regulations that apply to a particular zone. *Id.*

We review the Council's action in zoning matters as administrative agency action. *Cnty. Council for Prince George's Cnty. v. Carl M. Freeman Assocs., Inc.*, 281 Md. 70, 74 (1977); Md. Rule 7-201(b). We look through the decisions of the trial court and evaluate agency action directly. *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 359 (2022).

For Prince George's County, Section 22-407 of the Land Use Article provides the standards of judicial review for the Council's "final decision[s]" in zoning matters. LU § 22-407(a)(1), (e); *see also Town of Upper Marlboro v. Prince George's Cnty. Council*, 480 Md. 167, 181, 191 (2022); *Cnty. Council of Prince George's Cnty. v. Chaney Enters. Ltd. P'ship*, 454 Md. 514, 528-31 (2017). Both legislative and quasi-judicial acts by the

---

[16] Here, we use the terms "district" and "zone" interchangeably.

19

Council constitute reviewable "decisions." *Chaney Enters.*, 454 Md. at 531 n.12 (clarifying that zoning "decision[s]" under LU § 22-407(a)(1) include legislative acts, in contrast to other statutes that limit review to zoning "actions"); *see also Town of Upper Marlboro*, 480 Md. at 180-81, 191 (reviewing legislative acts of Prince George's County Council under LU § 22-407).

Section 22-407(e) identifies the circumstances under which we may reverse or modify a zoning decision by the Council. The decision must be: "(i) unconstitutional; (ii) in excess of the statutory authority or jurisdiction of the district council; (iii) made on unlawful procedure; (iv) affected by other error of law; (v) unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or (vi) arbitrary or capricious." LU § 22-407(e).

Quasi-judicial decisions may be reversed or modified under any of the above circumstances. *Town of Upper Marlboro*, 480 Md. at 180-81, 191. In contrast, we review legislative decisions only for legality, which implicates only provisions (i) to (iv) of the list above. *Id.* Review for legality "is an even more limited standard than the already narrow review for arbitrary and capricious action, or for action unsupported by substantial evidence." *Talbot County v. Miles Point Prop., LLC*, 415 Md. 372, 393 (2010).

Here, the Council's enactment of CB-17 was "in the nature of" a legislative action. *MBC Realty*, 192 Md. App. at 234 (holding that a text amendment is "in the nature of a legislative action"); *see Md. Overpak Corp. v. Mayor of Balt.*, 395 Md. 16, 35 (2006).[17]

---

[17] Community members and at least one councilmember protested the Council's decision to use a text amendment here, arguing that Freeway Airport should have applied

20

Legislative action enjoys a strong presumption of validity; we do not substitute our policy judgments for those of the legislature, and we assume as the action's basis any reasonably conceived state of facts that would sustain it. *See Rylyns*, 372 Md. at 535, 542-43 ("Because special exceptions [and conditional uses] are legislatively-created[,] . . . they enjoy the presumption of correctness[.]"); *Anderson House*, 402 Md. at 723-24 (discussing the presumption in the context of original zoning and comprehensive rezoning). The challenger to the law or regulation "carries the heavy burden of establishing, by clear and affirmative evidence" the invalidity of the action. *Anderson House*, 402 Md. at 724.

---

for a piecemeal rezoning—a quasi-judicial action. Those critics saw CB-17 and text amendments broadly as ways to circumvent the more rigorous requirements of quasi-judicial action.

In that vein, Concerned Citizens argued before the circuit court and Appellate Court that CB-17 unlawfully bypassed what they contended were the required quasi-judicial procedures for "site-specific zoning action." The Appellate Court did not reach this issue, instead invalidating CB-17 on uniformity grounds.

In *MBC Realty*, opponents of a text amendment which, in effect, allowed only a single arena to install new billboards, argued that the amendment was piecemeal zoning. 192 Md. App. at 238. The Appellate Court rejected that argument, reasoning that the amendment did not change the assigned zone of the arena. The same reasoning applies here.

Additionally, neither the Land Use Article nor the Prince George's County Code require that "site-specific" zoning decisions be subject to quasi-judicial proceedings, despite providing for rules in other specific situations. *See* LU § 22-206 (providing for text amendment procedures); LU § 22-301 (providing authority to grant special exceptions and variances); PGCC §§ 27-143 to 27-157 (providing rules for map amendments); PGCC §§ 27-214 to 27-219 (providing rules for text amendments); PGCC §§ 27-296 to 27-418 (providing rules for special exceptions). Though applying for piecemeal rezoning may have been available to Freeway Airport, the Council was permitted to act legislatively.

21

## DISCUSSION

Concerned Citizens challenges the legality of CB-17 on the grounds that the ordinance violates the uniformity requirement, which requires zoning laws to "be uniform for each class or kind of development throughout a district or zone." LU § 22-201(b)(2)(i). Concerned Citizens argues, and the Appellate Court agreed, that CB-17 violates uniformity because the Council narrowly tailored it to single out[18] the Freeway airport as the only qualifying property.

Maryland's uniformity statutes, the likes of which nearly all other states have adopted, *Anderson House*, 402 Md. at 713 & n.20, reassure property owners that they will not be subject to "arbitrary" or "invidious" discrimination, *id.* at 717-20, or government favoritism or coercion, *id.* at 716 (quoting *Rylyns*, 372 Md. at 536).[19] Modern courts, including this one, understand uniformity as a state law counterpart to "the constitutional equal protection prohibition against purely arbitrary zoning classifications and restrictions," and generally apply similar principles of review. 1 *Rathkopf's The Law of*

---

[18] The term "singling out" in Maryland uniformity cases first appears, to our knowledge, in *Anderson House*, 402 Md. at 714, 715 n.21, 717, 720, though the concept appeared long before then in spot zoning cases, *see, e.g.*, *Rylyns*, 372 Md. at 546.

[19] Maryland's uniformity statutes adopt, nearly verbatim, the language of the Standard State Zoning Enabling Act, a model act promulgated by the U.S. Department of Commerce. The model act provides: "All such regulations shall be uniform for each class or kind of buildings throughout each district." A STANDARD STATE ZONING ENABLING ACT § 2 (U.S. DEP'T OF COMMERCE 1926).

Courts have also described improper discrimination as "unfair," *Anderson House*, 402 Md. at 720, "unequal," *id.*, "ad hoc," *id.* at 714, and "unreasonable," *Rylyns*, 372 Md. at 546 (describing illegal spot zoning).

22

*Zoning and Planning* § 4:8 (4th ed. rev. 2023) ("*Rathkopf*") (citing *Woodward & Lothrop*, 280 Md. 686); *see also Anderson House*, 402 Md. at 719 n.23 (comparing the Equal Protection clause analysis to uniformity analysis). Spot zoning cases, which typically involve uniformity or uniformity-like challenges to piecemeal rezonings, are also instructive.[20] *See, e.g.*, *Cassel v. Mayor of Balt.*, 195 Md. 348 (1950); *Hewitt v. Cnty. Comm'rs of Baltimore Cnty.*, 220 Md. 48 (1959).

We may consider direct and circumstantial evidence, including "the historical background of the decision under [legislative] challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by the members of the decisionmaking body." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (describing the standard of review in an equal protection challenge).

Regulations that draw classifications between properties within a zone are, as a general matter, permissible. The leading cases in Maryland's limited uniformity case law provide that such regulations do not violate uniformity when "reasonable and based upon the public policy to be served," *Woodward & Lothrop*, 280 Md. at 720, and when "similarly situated properties are treated the same[,]" *Anderson House*, 402 Md. at 715.

---

[20] "Spot zoning occurs when a small area in a District is placed in a different zoning classification than the surrounding property[.]" *Rylyns*, 372 Md. at 546 (quoting *Tennison v. Shomette*, 38 Md. App. 1, 8 (1977)).

### *Public Purpose*

Two of our leading uniformity cases present examples of regulations based upon valid public purposes, that is, "the public policy to be served." *Woodward & Lothrop*, 280 Md. at 720. In *Woodward & Lothrop*, we upheld regulations discriminating between properties in the same zone based on size and the year that the use began, when those regulations furthered "the legislative purpose of encouraging land assembly to permit cohesive development and to assure open spaces and other amenities[.]" *Id.* at 721. And in *Anderson House*, we found that regulations tailored to existing property conditions— which, in effect, created classifications—helped "avoid[] the need for a race to obtain variances lest existing developed properties become nonconforming," 402 Md. at 719, "minimiz[ed] the impact of businesses on adjacent residential properties," *id*. at 725 n.26, and "preserv[ed] the residential character of the existing structures and lots," *id.*

In contrast, zoning regulations have been held invalid when they lack a public purpose. In *Cassel v. Mayor of Baltimore*, we invalidated the rezoning of a single property in a larger residential zone because the sole purpose of the rezoning was to allow the property owner to operate a funeral home, not to satisfy any apparent public need. 195 Md. at 358 (finding little local demand for funeral homes, three existing funeral homes within a close distance, and proximity to a commercial district where the funeral home could have operated instead). Similarly, in *Hewitt v. County Commissioner of Baltimore County*, we struck down a zoning map amendment reclassifying two properties in a large residential area to business zoning when the only evidence of a public benefit was a vague, speculative notion of serving travelers from a nearby expressway. 220 Md. at 62-63.

24

The requirement that there be a valid public purpose promotes uniformity by protecting against mere favoritism toward particular parties. For example, in *Board of County Commissioners of Washington County v. H. Manny Holtz, Inc.*, the Appellate Court invalidated the piecemeal rezoning of a property because the Washington County Board of County Commissioners (the "Board") had, merely to appease certain neighbors, restricted the allowable uses of the property as a condition of approval. 65 Md. App. 574, 576-77 (1985); *see also Benner v. Tribbit*, 190 Md. 6, 20 (1948) (describing invalid zoning regulations, broadly, as "arbitrary permission to A and prohibition to B to use their own property, at the pleasure of neighbors or at the whim of legislative or administrative agencies"); *Rockville Fuel & Feed Co. v. City of Gaithersburg*, 266 Md. 117, 130 (1972) (discussing an invalidated ordinance where "the sole basis for [different treatment] was a 'plebescite [sic] of neighbors' without any supporting evidence that related to the public health, comfort, safety or welfare []").

Here, CB-17 furthers a public purpose by incentivizing the redevelopment of land currently used for a nonconforming and dangerous airport. Eliminating the risk of plane crashes, particularly in a residential area, without question furthers an interest in public safety, and Concerned Citizens has not argued otherwise. Moreover, some constituents and at least one local association supported CB-17 because they expected townhouse development would benefit the local economy.

The Council was presented with the following arguments and information, which together make up a "state of facts reasonably [] conceived that would sustain" the Council's

25

enactment of CB-17.  *See Anderson House*, 402 Md. at 724 (quoting *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 427 (1978)).

1. A history of crashes and fatalities relating to aircraft taking off or landing at the Freeway airport.  This record included detailed maps in the record showing crash events—some fatal—and testimony from the owners of the airport.

2. Testimony from an employee of the Freeway airport describing the risks presented by nearby transmission lines and residences.

3. A history of the County's past efforts to mitigate crashes involving aircraft from the Freeway airport (and other airports), the harms from which were exacerbated by the growth of nearby housing developments.  The County's efforts included studies and implementation of safety regulations.

4. Support from some residents and members of the Chamber of Commerce on the grounds that development of townhouses would provide economic benefits and that continued use of the property as an airport would be inappropriate.

Additionally, the elimination or mitigation of nonconforming uses is, as a general matter, a valid public purpose.[21]  *Trip Assocs.*, 392 Md. at 573.  That is because nonconforming uses are, by definition, incompatible with the zone in which they are located and thus reduce uniformity.  *Cnty. Council of Prince George's Cnty. v. E. L. Gardner, Inc.*, 293 Md. 259, 267 (1982) ("[N]onconforming uses pose a formidable threat to the success of zoning" because they "limit the effectiveness of land use controls, . . . imperil the success of the community plan, and injure property values.").  For instance, we have upheld as a proper exercise of the police power a regulation that phased out all

---

[21] Concerned Citizens did not argue before the circuit court or Appellate Court that discontinuing a nonconforming use, either as a general matter or as applied here, is not a valid public purpose.  The question did not even arise until the Appellate Court held that CB-17's effort to eliminate a nonconforming use did not overcome the uniformity challenge.  *Concerned Citizens*, 255 Md. App. at 126-27.

26

nonconforming junk yards within two years. *Shifflett v. Baltimore County*, 247 Md. 151, 154 (1967). Here, the Freeway airport has been a legal nonconforming use since 1968, when the mostly rural area was first zoned as R-A. Moreover, the airport has become, over time, even less practically suited to the increasingly suburban area.

The circumstances here contrast with those in *Cassel*, 195 Md. 348, and *H. Manny Holtz*, 65 Md. App. 574, where we invalidated regulations that *reduced* uniformity. In *Cassel*, we invalidated the rezoning of a property located in an established residential neighborhood that had previously been used as a residence. 195 Md. at 357-58. The property had been rezoned to commercial use to allow the owner to run a funeral home. *Id.* That is not a use most people would call "in harmony with" a residential area. *Id.* at 355.

In *H. Manny Holtz,* a property owner sought a rezoning of his property from residential to business to operate a convenience store. 65 Md. App. 574. There, the Board, in its legislative capacity, had *already* established the appropriate uses for the business zone, which included a convenience store use. *Id.* at 577 n.1, 583 n.3. Subsequently, the Board, in its quasi-judicial capacity, *restricted* the uses of only the applicant's property to prohibit convenience store use. *Id.* at 577.[22] Thus, the Board's action not only deviated from the zoning ordinance, but *reduced* uniformity. Moreover, the Board stripped the property owner of a use to which he was otherwise entitled. In contrast, the Council here, in its legislative capacity, passed a text amendment that determined *in the first instance* the

---

[22] The Appellate Court also said that because the Board had already legislatively designated the permitted uses in the zone, "the exclusion of any one or more uses by the County Commissioners in its quasi-judicial capacity [was] a usurpation of the legislative function." *H. Manny Holtz*, 65 Md. App. at 583 n.3.

possible uses in the R-A Zone and could be seen as *increasing* uniformity by encouraging an out-of-place airport to redevelop as housing in a largely residential area.[23]

Concerned Citizens, having failed to argue that decommissioning the Freeway airport, or any other similar airport, has no valid public purpose, instead has presented evidence of public opposition to CB-17. Indeed, dozens of community members and other public officials opposed higher-density housing development at the Freeway airport. But Concerned Citizens conflates public sentiment with public purpose. Our duty is not to weigh public opinion or debate public policy, but to determine only whether specific legislation reasonably serves a public purpose.

Concerned Citizens argues that any of the ostensible public purposes for CB-17, even if valid on their face, are mere pretext for favoritism toward Freeway Airport. In doing so, counsel for Concerned Citizens acknowledged to the circuit court that the Council, in enacting CB-17, expressed a concern for public safety:

> I mean, come on. How can the District Council. . . not understand and accept all of this nonsense about how dangerous the airport is[?] Yes, maybe the airport is dangerous. Maybe when it started in the '40s, it was in the middle of nowhere.

---

[23] Nor does this case present the same risk of "emasculat[ing] the uniformity requirement," *see H. Manny Holtz*, 65 Md. App. at 584, as in *Cassel* and *H. Manny Holtz*. In those cases, the courts feared that upholding the challenged regulations could be "an opening wedge for other enterprises," *Cassel*, 195 Md. at 358, and encourage the "piecemeal proliferations [sic] of [] mini-districts [,]" *H. Manny Holtz*, 65 Md. App. at 584.

We see little risk that CB-17 will push Prince George's County down a slippery slope into zoning chaos. If anything, CB-17 is just another ordinance in a long line of exceptions, carveouts, and workarounds to Prince George's County's antiquated zoning ordinance (the Old Zoning Ordinance). Indeed, the enactment of the New Zoning Ordinance was largely motivated by a desire to streamline zoning and do away with such exceptions.

Concerned Citizens claims, however, that the Council's concern was either disingenuous or induced by Freeway Airport through improper means, and that the real driver of CB-17 was "development, money."

Concerned Citizens has repeatedly alleged the existence of an illegal or unethical relationship between the Council and Freeway Airport. The Appellate Court appeared to share this view, expressing concern with what it perceived as a "worrisome dynamic between public and private interests." *Concerned Citizens*, 255 Md. App. at 126. According to the Court, the Council appeared to have bestowed a "mere favor" upon Freeway Airport, *id.* at 125-26, enacting CB-17 "merely to accommodate private interests detrimental to the welfare of other property owners in the same district[,]" *id.* at 126 (quoting *Page v. City of Portland*, 165 P.2d 280, 283 (Or. 1946)). In this vein, the Appellate Court questioned the credibility of the public safety interest in closing the Freeway airport, citing the airport's "[i]ncongruous[]" plan to intensify operations if unable to develop higher-density housing. *Id.* at 122.

Concerned Citizens has not, however, identified evidence of favoritism toward Freeway Airport, instead merely insinuating that developers have contributed to the election campaigns of councilmembers. The record provides no reason to think the Council would *not* have passed CB-17 if some other party owned or intended to develop the airport. The only specific example of impropriety we have discerned in the record is the allegation by nearby residents that the developer used misleading tactics to solicit support for the proposed development. Concerned Citizens has not shown, however, how the developer's

29

actions implicate the motives of the Council in enacting CB-17.[24] And, that Freeway

Airport's plans under one scenario might conflict with the public safety interest does not

undermine the public safety interest in closing the airport. If anything, Freeway Airport's

alternative plan to intensify flight operations could reasonably *heighten* that interest.[25]

Nor are we moved that Freeway Airport pushed the Council to adopt CB-17 by

raising the undesirable prospect of increased airport operations. *See Concerned Citizens*,

255 Md. App. at 126 (remarking that the airport owners leveraged their "allegedly

dangerous" airport to "bull[y]" the Council into enacting favorable legislation). Whether

---

[24] In any event, the Council was made aware of these allegations at public hearings.

[25] The Appellate Court also contended that the Council lacks authority to make land use policy relating to airport safety, reasoning that regulation of airport safety is the domain of the State. *Concerned Citizens*, 255 Md. App. at 122-23. We disagree. The Council did not purport to enact an airport safety policy. This was merely a text amendment to encourage the decommissioning of an airport, which was squarely within the Council's domain.

Moreover, though the State is indeed responsible for many aspects of airport regulation, that authority does not preclude political subdivisions from establishing airports and enacting certain regulatory measures to promote their safety. State law explicitly allows political subdivisions to establish airports, Md. Code. Ann., Transp. ("TR") § 5-416 (1977, 2020 Repl. Vol.), encourages them to adopt zoning regulations to eliminate airport hazards, TR § 5-602, and affords them authority to "adopt, under its police power, airport zoning regulations to protect the aerial approaches of [a]ny airport not owned by this State," TR § 5-604(a). *See also Rathkopf* § 85:3 ("State courts generally have rejected implied state preemption claims based on state licensing or regulation of pilots or aircraft, or control of other aspects of airport development and operation.") (footnote omitted).

In fact, Prince George's County has already used zoning regulations to promote airport safety. The County established Aviation Policy Areas "to establish a standard of safety and compatibility for the occupants of land in the immediate vicinity of airports[.]" PGCC § 27-548.32; *see also* PGCC § 27, Part 10B. These areas are subject to detailed regulations, covering everything from development density to the proliferation of birds that might interfere with flight paths. PGCC § 27-548.38.

the operative word is "bullied," "pressured," "persuaded," "influenced," or "encouraged," the result is the same. That Freeway Airport, a private company, presented the Council with two options—including one at odds with the public interest—does not evidence corruption, but a business decision. Even if the Council conceded more than what was necessary to incentivize redevelopment of the property, such miscalculation does not sustain a uniformity challenge. Accountability for any such error in judgment must come from the voters, not the courts.

### *Facial Neutrality*

Concerned Citizens asks us to infer, as the Appellate Court appears to have done, that the Council improperly favored Freeway Airport simply because CB-17 is "site-specific,"[26] "tailored" in an "excruciatingly detailed" manner to "single out" the Freeway airport without mentioning it by name. Concerned Citizens thus asks us to look beyond the facial neutrality of CB-17 to the reality of its practical application.

Freeway Airport, on the other hand, argues that facial neutrality is the *only* requirement to survive a uniformity challenge, understanding *Anderson House* to require only that the same terminology *apply* to all properties in a zone. Freeway Airport finds support in our statements there that "uniformly applicable regulations that produce disparate results in application do not violate the uniformity requirement," *Anderson*

---

[26] In this context, we understand the term "site-specific" to mean affecting one or just a few properties. Though the term is used broadly in the zoning context, *see Rathkopf* § 60, the term does not appear to have any basis in Maryland uniformity law, as it is absent from our key uniformity cases. *See, e.g.*, *Anderson House*, 402 Md. 689; *Woodward & Lothrop*, 280 Md. 686; *H. Manny Holtz*, 65 Md. App. 574; *Rylyns*, 372 Md. 514.

*House*, 402 Md. at 717; that "zoning regulations need to be equally applicable," *id.* at 719 n.23; and that we focus "upon the terminology of the ordinance, rather than upon its application," *id.* at 718 (quoting *Woodward & Lothrop*, 280 Md. at 720). If Freeway Airport is correct, CB-17 is valid because, regardless of the results, it is facially neutral.

Facial neutrality, though relevant to our analysis, is not, on its own, a sure defense to a uniformity challenge. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 534 (holding, in an equal protection context, that facial neutrality is not determinative when evaluating claims of improper discrimination). Rather, regulatory classifications must "be founded *in real and not feigned differences* having to do with the purpose for which the classes are formed." *Rumson Ests., Inc. v. Mayor of Fair Haven*, 828 A.2d 317, 330 (2003) (emphasis added) (quoting *Roselle v. Wright*, 122 A.2d 506, 511 (N.J. 1956)). Otherwise, legislators could circumvent the uniformity requirement with clever drafting. Indeed, facial neutrality in *Woodward* and *Anderson House* was not enough to survive a uniformity challenge—we also required a showing of a reasonable relationship to a public purpose and equal treatment of similarly situated properties.

Moreover, courts in the out-of-state cases that we reviewed in *Anderson House* required the same showing. 402 Md. at 714-15 (citing *Rumson Ests.*, 828 A.2d 317 and *Harris v. Zoning Comm'n of New Milford*, 788 A.2d 1239 (Conn. 2002)). We distinguished the regulations in those cases from ones that did not further the public welfare, which were consequently invalidated. *Anderson House*, 402 Md. at 725 n.26 (citing *Hamer v. Town of Ross*, 382 P.2d 375 (Cal. 1963) and *C & M Devs., Inc. v. Bedminster*, 820 A.2d 143 (Pa. 2002) and *Nat'l Land and Inv. Co. v. Kohn*, 215 A.2d 597 (Pa. 1965)).

32

Concerned Citizens argues that CB-17 is invalid because it is too site-specific. Concerned Citizens highlights not only the narrowly drafted qualifying criteria, but also what the Dissent calls the "very limited shelf life" of CB-17.  Dissenting slip op. at 9, 45, 71.  Concerned Citizens and the Dissent contend that the Council, aware that the previously enacted New Zoning Ordinance would soon take effect, not only understood the Freeway airport to be the sole qualifying property at that time, but likely for *all* time.  Dissenting slip. op. at 9 ("[CB-17] did not have *any prospective application* beyond the Freeway Property."); *id.* at 65.

The record is not clear, however, that other properties—including non-airport properties qualifying under the property size criterion—could not have developed under CB-17 between its effective date of January 4, 2020, and the effective date of the New Zoning Ordinance, April 1, 2022.  When the Council considered CB-17, the effective date of the New Zoning Ordinance was unknown, as it was contingent upon the Council's adoption of the countywide sectional map amendment—an outcome which, at the time, was not itself guaranteed.  Indeed, the sectional map amendment was not enacted until April 1, 2022.  *See* note 9, *supra*.  In other words, CB-17 was in effect for more than two years, during which time other property owners could have sought to develop under the ordinance.  Nonetheless, for purposes of our analysis, we proceed as if the Council, in enacting CB-17, intended to reach only the Freeway airport and believed it would be the only property to ever qualify under, and take advantage of, CB-17.

33

We do not think that a regulation's "site-specific" intent or effect alone sustains a uniformity violation. That a regulation affects only one or a few properties, though relevant to our uniformity analysis, is not dispositive. *See Rylyns*, 372 Md. at 543-44 (quoting *Collard v. Village of Flower Hill*, 421 N.E.2d 818, 821 (N.Y. 1981) ("[Z]oning is not invalid per se merely because only a single parcel is involved or benefitted[.]")); *id.* at 546 (explaining that spot zoning is not per se invalid). For example, the piecemeal rezoning in *Cassel* was invalidated not because it affected one property—which is the definition of piecemeal rezoning—but because it discriminated between similarly situated properties *without good reason*. 195 Md. at 357-58.

This proposition holds not only when regulations inadvertently affect only one or a few properties, but even when a zoning authority deliberately targets a particular property or properties. *See Rockville Fuel & Feed*, 266 Md. at 130 (upholding a text amendment challenged on equal protection grounds even though it was enacted for the sole purpose of thwarting the construction of a specific concrete mixing plant). That a legislature may contemplate a specific property does not prove the absence of a public purpose, or arbitrary or invidious discrimination; we do not require legislatures to conceive of legislation "as an abstraction" without any actual properties in mind. *MBC Realty*, 192 Md. App. at 236. And though Concerned Citizens portrays the Council's "site-specific" efforts as alarming, such amendments are not unusual and are often initiated by private interests.[27]

---

[27] *See O'Donnell v. Basslers, Inc.*, 56 Md. App. 507 (1983) (owner of a private airfield seeking to develop a commercial airport and who successfully petitioned the zoning board for a text amendment allowing commercial airports in certain zones); *MBC Realty*, 192 Md. App. at 223-26 (noting that "every conditional use that has been added to the

34

For example, in *MBC Realty, LLC v. Mayor of Baltimore*, the City Council of Baltimore enacted a text amendment, at the express request of a development company, allowing new billboards in the "B-5" zone only on publicly owned stadiums and arenas, knowing that only the First Mariner Arena would be eligible. 192 Md. App. at 226 & n.5, 235-36. Immediately after, the City Council granted the conditional use to that arena. *Id.* Though the text amendment was not challenged on uniformity grounds, the Appellate Court rejected the challengers' argument that the circumstances proved favoritism and a lack of public purpose, holding that we "[do] not impose a [] knowledge limitation upon the legislative act." *Id.* at 236.

Thus, the Appellate Court upheld a text amendment solicited by a private interest and targeting one property both in intent and effect. Moreover, as with CB-17, only one property would *ever* likely qualify under the text amendment, given that the text

Baltimore City Zoning Code since 1971 has been effectuated by means of a text amendment").

Other times, opponents of development or certain uses seek "site-specific" text amendments to restrict uses by others. *See Rockville Fuel & Feed*, 266 Md. at 119-23 (text amendment prohibiting concrete manufacturing that the City of Gaithersburg enacted as an emergency measure just one day before the plaintiff property owner sought final approval for a special exception to construct and operate a concrete manufacturing plant); *Free State Recycling Sys. Corp. v. Bd. of Cnty. Comm'rs for Frederick Cnty., Md.*, 885 F. Supp. 798 (D. Md. 1994) (zoning board that sought to close a recycling facility with a text amendment that would impose impossibly burdensome regulations on the facility). For example, citizens thwarted Costco's plans to install a large gas station at the Westfield Wheaton Mall by persuading the Montgomery County Council, on two separate occasions, to pass text amendments requiring greater distance between large gas stations and nearby communities. Bill Turque, *Wheaton Costco Gas Station Nixed by Montgomery Planning Board*, WASH. POST, Mar. 1, 2013; Bill Turque, *Costco Loses Latest Round in Fight to Open Big Gas Station at Wheaton Mall*, WASH. POST, Dec. 21, 2015; MONTGOMERY COUNTY, MD., ZONING ORDINANCE § 59-3.5.13.C (2023).

amendment applied only to publicly-owned stadiums and arenas. Yet those circumstances did not give rise to a finding of improper favoritism. *Id.*; *see also Eutaw Enters., Inc. v. City of Baltimore*, 241 Md. 686, 696 (1966) (upholding ordinances that the City Council knew would only affect one commercial check casher because the ordinances were general in application and applied equally to similarly situated properties).

Finally, we note that the "painstakingly specific" tailoring to which Concerned Citizens points as evidence of favoritism toward Freeway Airport was prompted in part by opposition to higher-density housing on *other* properties. For instance, at the request of the President of the Woodmore Homeowner's Association, the Council passed a narrowing amendment to ensure that the Hidden Pond parcel in Woodmore would not qualify for higher-density housing. Similarly, the provision requiring a minimum acreage of 100 acres was proposed not by Freeway Airport but by an outspoken critic of CB-17, Councilmember Dernoga, to "further limit the number of [qualifying] properties." Councilmember Dernoga had also proposed, unsuccessfully, to reduce the proximity to electrical infrastructure requirement from 2,500 feet to 2,000 feet—again, to limit the number of qualifying properties. Thus, at least some of the "painstakingly specific" tailoring of which Concerned Citizens complains arose not out of demands by Freeway Airport but, ironically, out of concerns by others that non-Freeway airport properties might qualify for higher-density development.

*Similarly Situated Properties*

A finding that a regulation furthers a public purpose does not mark the end of our uniformity analysis. We also examine how the regulation operates, specifically whether it discriminates between properties in a reasonable manner. *Woodward & Lothrop*, 280 Md. at 720 ("*reasonable* and based upon the public policy to be served" (emphasis added)).

It is worth repeating that discrimination between properties within a zone, i.e., regulatory classification, is not per se prohibited. We held in *Anderson House* that "[t]he crux of the [uniformity] requirement is only that *similarly situated* properties are treated the same under the zoning regulations," 402 Md. at 715 (emphasis added), observing that "[m]any jurisdictions agree that the kind of discrimination violative of the uniformity requirement occurs when a zoning ordinance singles out a property or properties for different treatment than others *similarly situated*," *id.* at 714 (emphasis added). A regulation that discriminates between similarly situated properties is invalid.

What it means for properties to be "similarly situated" is central to understanding the apparent disconnect between the parties' arguments, and between ours and the Dissent's. Concerned Citizens assumes that all properties in the R-A Zone are, by definition, similarly situated and that site-specific classification within the zone thus violates uniformity. Just because properties are within the same zone, however, does not make them similarly situated; zoning categories are not determinative. *Rylyns*, 372 Md. at 593 (Cathell, J., dissenting) (quoting *Sweetman v. Town of Cumberland*, 364 A.2d 1277, 1288 (R.I. 1976)) (establishing, in a conditional use challenge, that "[o]wners of property in the same land-use category are not necessarily 'similarly situated' so that they must be

treated identically under the equal protection clause. . . . [T]wo parcels may have been classified at different times when the needs of the municipality differed. Different pieces of property [in the same zone] may also have physical characteristics which differ enough to require some minor differences in use restriction[.]").[28]

Properties are similarly situated when there is no reasonable basis to treat them differently; regulations thus violate uniformity when they discriminate between properties unreasonably. *See Anderson House*, 402 Md. at 714 (discussing *N.T. Hegeman Co. v. Mayor of River Edge*, 69 A.2d 767 (N.J. 1949), where the setback requirement that was invalidated applied to only one block of a business district without any apparent reason for disparate treatment); *id.* at 715 (discussing *Veseskis v. Bristol Zoning Comm'n*, 362 A.2d 538 (Conn. 1975), where the invalidated ordinance applied only in one specific instance, but not in other instances presenting the same circumstances); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000) (invoking the concept of "similarly situated" in an equal protection claim). For example, as we cited in *Anderson House*, 402 Md. at 715 n.21, a Wisconsin court struck down, on uniformity grounds, an ordinance exempting one of four parcels in the same zone from obtaining a permit for a rendering plant because the exemption was "not based upon substantial distinctions which make the operation of a rendering plant and packing plant in one area of the industrial district different from any other areas in the industrial district," *Boerschinger v. Elkay Enters., Inc.*, 145 N.W.2d 108, 110-11 (Wis. 1966).

---

[28] Conversely, just because properties are zoned differently does not permit invidious discrimination between properties. *Rathkopf* § 4:8.

In *Anderson House*, we upheld zoning regulations that discriminated between properties based on size and produced different—and even unique—results. 402 Md. at 720. In doing so, we, by implication, held that properties of different sizes were *not* similarly situated and could thus be treated differently under the regulations. Similarly, in *Woodward & Lothrop*, we upheld density regulations based on property size, thus recognizing properties 22,000 square feet or larger as not similarly situated to smaller properties. 280 Md. at 721. We did the same for the compliance requirements there, which differed according to whether the use of the property began before or after January 1, 1959. *Id.* at 722-23.[29]

---

[29] The Dissent distinguishes CB-17 from the valid regulations in *Anderson House*, *Woodward & Lothrop*, and *MBC Realty*, on the grounds that those cases involved original and comprehensive zoning or text amendments having "general application" in a zone. Dissenting slip op. at 7-8, 35 & n.15. By "generally applicable," we understand the Dissent to be describing regulations affecting many properties broadly, even if they produce different or unique results among properties in the zone. *See* Dissenting slip op. at 31, 34-36; *see also Anderson House*, 402 Md. at 715. The Dissent distinguishes between "generally applicable" regulations and those which target a property or properties. Dissenting slip op. at 7-8, 34-36. Council Bill 17, the Dissent contends, is invalid because, as applied, it affects only one property, even if the entire body of regulations applying to the R-A Zone are facially neutral and apply uniformly. Dissenting slip op. at 7-10, 34-36, 41.

As an initial matter, in our view, the Dissent misconstrues the text amendment held valid in *MBC Realty*, 192 Md. App. 218, as having "general prospective application[.]" Dissenting slip op. at 35 n.15. There, the City Council of Baltimore enacted Ordinance 03-514, at the explicit request of a development company, to "amend[] the text of the Zoning Code to create for the B-5 district a conditional use for new billboards on publicly owned stadia and arenas[.]" *MBC Realty*, 192 Md. App at 226 & n.5. The City Council knew that only the First Mariner Arena would be eligible for the conditional use. *Id.* at 226, 235-36. That does not strike us as a text amendment having "general application."

Instead, Council Bill 17 stands out for how transparently the Council targeted the Freeway airport, as manifested by the legislative history. That seems to be, at heart, what

Perhaps hypotheticals will help. Imagine two identical, adjacent single-family houses. A regulation, with narrowly drafted and facially neutral terms, allows House A to install a backyard swimming pool, but not House B. The owner of House B could argue that the regulation violates uniformity because his property is similarly situated to his neighbor's and, yet, his property is treated differently.

Or, under the circumstances here, imagine a property in an R-A Zone that was formerly used as an airport, has freeway frontage, and is within one mile of a municipality, but fails to qualify for higher-density development under CB-17 because it is 3,000 feet from the nearest electrical infrastructure rather than entirely within 2,500 feet, as CB-17 requires. The owner of that property could argue that the regulation violates uniformity because the property is similarly situated to the Freeway airport and yet is excluded because of the 2,500-foot requirement. At that point, the Council would have to explain why the 500-foot difference between 3,000 feet and 2,500 feet is reasonable and based in public

the Dissent takes issue with. Dissenting slip. op. at 9-10 ("[T]he legislative record in this case contains a robust discussion among the decisionmakers that reflects a clear and unmistakable intent to draft criteria that would apply only to the Freeway Property."). Transparency, however, should not count as a demerit in a uniformity analysis.

Indeed, transparency seems to be the antidote to the Dissent's concern that our holding will encourage landowners to secure favorable text amendments through ex parte communications with local elected officials. Dissenting slip. op at 68. But enacting a text amendment requires much more than obtaining the sponsorship of a single elected official. In Prince George's County, enacting a text amendment requires a public hearing with adequate notice to the public. PGCC § 27-216. The proposed amendment must be referred to the Planning Board for comments and a recommendation. PGCC § 27-217. Moreover, an amendment generally requires multiple readings and consideration by the appropriate standing committee. *See* THE CNTY. COUNCIL RULES OF PROC. (CNTY. COUNCIL FOR PRINCE GEORGE'S CNTY., MD. JULY 2020). A text amendment requires a majority vote of the full Council, PGCC § 27-218. Prince George's County Charter, Art. IV, § 411.

policy. If the Council lacks a credible explanation, then that regulation would evince the sort of arbitrariness or favoritism characteristic of a uniformity violation.

Here, CB-17 discriminates between properties, but Concerned Citizens has not shown that CB-17 discriminates between *similarly situated* properties. Concerned Citizens has not identified any actual, or even hypothetical, properties similarly situated to the Freeway airport that the qualifying criteria of CB-17 excluded from higher-density development opportunities.[30]

This comes as little surprise, as there are presumably few, if any, properties in the R-A Zone that reasonably resemble the Freeway airport. Instead, Concerned Citizens assumes that *all* R-A Zone properties are, by definition, similarly situated. Not only is that assumption legally erroneous, *see Rylyns*, 372 Md. at 593 (Cathell, J., dissenting), but it is practically flawed, for many other existing properties in the R-A Zone are very different from the airport. For instance, the properties featuring single-family detached residences in nearby Waterford Estates are wholly different, practically speaking, from the 129-acre airport property, and treating them differently does not offend our sense of fairness.

Concerned Citizens has not argued that any of the qualifying criteria of CB-17 are unreasonable, i.e., that they discriminate between similarly situated properties or are not "based upon the public policy to be served." *Woodward & Lothrop*, 280 Md. at 720. As

---

[30] Nor does the Dissent. Instead, the Dissent appears to incorrectly shift the burden to Freeway Airport, pointing out that Freeway Airport failed to identify any other properties qualifying under CB-17 that would have showed that CB-17 had "general application." Dissenting slip op. at 7 ("Although the Majority alludes to 'similarly situated properties,' neither the Majority, nor Freeway identify any."); *id.* at 63-64 n.30.

previously noted, that topic arose only when the Appellate Court questioned Freeway Airport during oral argument. The Court then took it upon itself to evaluate the reasonableness of those criteria, finding that the requirements of proximity to a municipal boundary and freeway frontage could reasonably relate to a public interest, but that the requirement of proximity to electrical infrastructure and the provision making eligible former airport property do not. *Concerned Citizens*, 255 Md. App. at 125-26 & n.16.

We disagree with how the Appellate Court analyzed the qualifying criteria. The Court evaluated each criterion of CB-17 in a vacuum, focusing on the "site-specific" nature of each rather than the broader purpose of encouraging the closure of the Freeway airport and any other nonconforming airport presenting similar public safety risks, to the extent one exists. When viewed in this light, the qualifying criteria are "reasonable and based upon the public policy to be served." *Woodward & Lothrop*, 280 Md. at 720. Nearby highways, population centers, and transmission lines *are* the safety hazards at the Freeway airport. That these features are not uniquely hazardous at Freeway Airport, but other airports too, bolsters that finding. Moreover, the Council could have reasonably concluded that higher-density housing, though generally inappropriate in the R-A Zone, is appropriate near existing highway transportation, electrical infrastructure, and population centers.

The Appellate Court also seized upon the clause making eligible properties formerly used as airports, finding that it lacked a public purpose and was included only to select the Freeway airport, while finding the qualifying criterion of property size reasonably based upon public policy. *Concerned Citizens*, 255 Md. App. at 126. But identifying airport

42

property, and the Freeway airport specifically, *is* the public purpose here, and, if anything, the qualifying criterion based on property size is the peculiar provision.

Concerned Citizens speculates that the property size criterion was drafted to make CB-17 look less "site-specific"[31] and that the former airport provision was subsequently reintroduced either to (1) bolster CB-17's *ostensible* public purpose of decommissioning unsafe airports or (2) allow Freeway Airport to develop fewer than one hundred acres. The first possibility is irrelevant, as CB-17 indeed furthers a public policy of retiring a hazardous, nonconforming airport. The second possibility, even if true, would remain consistent with the aim of encouraging the redevelopment of the Freeway airport by allowing the developer greater flexibility.

Again, we assume any reasonably conceived state of facts that would sustain CB-17. *See Anderson House*, 402 Md. at 724. We can reasonably suppose—and, in the absence of contrary evidence, conclude—that the Council sought both to encourage the decommissioning of the Freeway airport and to provide for general housing needs on large properties near existing population centers and infrastructure. For these reasons, we cannot say that the disjunctive requirement of property size or former airport use is so unreasonable as to violate uniformity.

---

[31] That the Council drafted CB-17 to appear less "site-specific" by including other assemblages of properties, in addition to airports, does not change the fact that CB-17 was designed, as its critics contend, to target the Freeway airport. The Council's effort to make CB-17 more legally defensible by broadening its potential application is not, however, a sufficient basis to invalidate CB-17.

43

**CONCLUSION**

The Council, in enacting CB-17, exercised its authority under the RDA to amend the text of the Prince George's County zoning ordinance. LU § 22-104. We afford legislative action a strong presumption of validity, and Concerned Citizens has the "heavy burden of establishing, by clear and affirmative evidence[,]" that CB-17 is invalid. *Anderson House*, 402 Md. at 723-24. Consistent with that standard of review and burden of proof, we neither invalidate CB-17 on speculation that the Council acted with improper motives nor transfer the primary burden of proof to Freeway Airport.

Though Concerned Citizens has accurately observed that CB-17 targets the Freeway airport using narrow, site-specific language, Concerned Citizens has not shown that CB-17 lacks a public purpose or discriminates between similarly situated properties. Concerned Citizens has not established that CB-17 discriminates arbitrarily, either by providing examples of similarly situated properties that CB-17 treats differently or by establishing that its qualifying criteria are not reasonably based upon the public policy to be served. *See Woodward & Lothrop*, 280 Md. at 720; *Anderson House* at 402 Md. at 714-15. On these grounds, Concerned Citizens' uniformity challenge falls short.

For these reasons, we reverse the judgment of the Appellate Court and affirm the decision of the District Council. With respect to the issues that Concerned Citizens raised but were not reached by the Appellate Court, our analysis here substantially answers those questions and renders a remand unnecessary. *See* Md. Rule 8-604(d)(1).

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED. COSTS TO BE PAID BY RESPONDENTS.**

44

IN THE SUPREME COURT
OF MARYLAND*

No. 23

September Term, 2022

PRINCE GEORGE'S COUNTY COUNCIL, et al.

v.

CONCERNED CITIZENS OF PRINCE
GEORGE'S COUNTY, et al.

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Getty, Joseph M., (Senior Justice,
Specially Assigned),

JJ.

Dissenting Opinion by Booth, J., which Fader,
C.J. and Watts, J., join.

Filed: August 22, 2023

* At the November 8, 2022 general election, the
voters of Maryland ratified a constitutional
amendment changing the name of the Court of
Appeals of Maryland to the Supreme Court of
Maryland. The name change took effect on
December 14, 2022.

Respectfully, I dissent.

In this case, we must determine whether the Prince George's County Council, sitting as the District Council ("District Council"), was acting within its legal boundaries when it enacted CB 17-2019—a legislative zoning text amendment that permitted townhouse uses in certain limited circumstances in the Residential-Agricultural ("R-A") Zone, a Euclidean zone in the Prince George's County zoning ordinance that was in effect in 2019. *See Town of Upper Marlboro v. Prince George's County Council*, 480 Md. 167, 180–81 (2022) (explaining the standard of review for agency actions that are deemed to be legislative is limited to assessing whether the agency was acting within its legal boundaries); Maryland Code (2012, 2022 Supp.), Land Use ("LU") § 22-407(e).[1]  "Under this 'legal boundaries'

---

[1] In this case, it is undisputed that the Prince George's County Council, sitting as the District Council ("District Council"), was undertaking a legislative act (as opposed to a quasi-judicial act) when it enacted CB 17-2019.  The General Assembly has provided for judicial review of a District Council's decision pursuant to Maryland Code (2012, 2022 Supp.), Land Use ("LU") § 22-407(e), authorizing courts to:

  (1)  affirm the decision of the district council;
  (2)  remand the case for further proceedings; or
  (3)  reverse or modify the decision if substantial rights of the petitioner have been prejudiced because the district council's action is:

      (i)    unconstitutional;
      (ii)   in excess of the statutory authority or jurisdiction of the district council;
      (iii)  made on unlawful procedure;
      (iv)  affected by other error of law;
      (v)   unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or
      (vi)  arbitrary or capricious.

Under the statute, a court may reverse or modify the decision of the District Council if the court determines that the district council exceeded its statutory authority.  LU § 22-

1

standard, government legislative action will be permitted to stand as long as it was 'consistent with relevant law.'" *Talbot County v. Miles Point Prop., LLC*, 415 Md. 372, 393 (2010) (quoting *Judy v. Schaefer*, 331 Md. 239, 264–66 (1993)).

## I.

## Overview

In determining whether the District Council exceeded its legal boundaries in enacting CB 17-2019, we start our analysis with the State enabling statute that confers authority upon the District Council to enact text amendments within Euclidean zones. We begin our discussion with the enabling statute because, "[u]nder Maryland's constitutional scheme, a local government's authority to regulate land use may emanate only from the enabling legislation of the General Assembly." *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 504 (2015) (citations omitted). Indeed, where a local government adopts zoning legislation that is inconsistent with its enabling authority, this Court has not hesitated to hold that it is invalid.[2]

---

407(e)(3)(ii). This standard of review is consistent with our case law that describes the scope of our review of legislative actions as assessing whether the legislative body was acting within its legal boundaries. *Town of Upper Marlboro v. Prince George's County Council*, 480 Md. 167, 180–81 (2022); *Talbot County v. Miles Point Prop., LLC*, 415 Md. 372, 393 (2010).

[2] *See, e.g.*, *Mossburg v. Montgomery County*, 329 Md. 494, 496, 508 (1993) (holding that a provision of the Montgomery County zoning ordinance that required special exceptions to be granted by a "supermajority" vote was not "expressly authorized by the General Assembly in the zoning enabling statute" and was therefore invalid); *Richmark Realty Co. v. Whittlif*, 226 Md. 273, 276, 285–86 (1961) (invalidating an ordinance that purported to waive a zoning provision prohibiting the construction of a filling station within 300 feet of a park because it was arbitrary and discriminatory).

### A. The Enabling Statute and the Uniformity Requirement

It is undisputed that the R-A Zone is a Euclidean zone. The applicable State enabling statute requires that zoning laws enacted by the District Council for traditional Euclidean zones "*shall be uniform for each class or kind of development throughout a district or zone*." LU § 22-201(b)(2)(i) (emphasis added). If the zoning text amendment violates the "uniformity" requirement of the enabling statute, it is invalid. Although there is not a lot of case law on the uniformity requirement, courts consistently find the requirement violated in at least one scenario. That scenario "occurs when a zoning ordinance *singles out a property or properties for different treatment than others similarly situated.*" *Anderson House, LLC v. Mayor & City Council of Rockville*, 402 Md. 689, 714 (2008) (emphasis added). In *Anderson House*, this Court explained that "the uniformity requirement demonstrates that . . . discrimination in favor of, or against, particular properties . . . will not be tolerated." *Id.* at 717. In this case, we must determine whether the text amendment enacted by CB 17-2019 violates the uniformity requirement. By way of brief background, it is helpful to review CB 17-2019's provisions and the facts about the property at the center of this case, the Freeway Property.

### B. CB 17-2019

Prior to the enactment of CB 17-2019, townhouses were not permitted in the R-A Zone. The text amendment enacted by CB 17-2019 permitted townhouses to be constructed at a density of up to 4.5 dwelling units per acre in "certain circumstances." Those circumstances are that the townhouses could be constructed "on an assemblage of adjacent properties" that: (1)(a) is no less than 100 acres and no more than 150 acres in

3

size, or (b) "was formerly used as an airport"; (2) is located entirely within one mile of a municipal boundary; (3) is located "entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation, transmission, or distribution in connection with providing public utility service in the County by a regulated public utility"; and (4) "has frontage on a public right-of-way classified as a freeway or higher in the Master Plan of Transportation and is maintained by the State Highway Administration."

### C.    The Freeway Property

The Freeway Property, also known as Freeway Airport, is owned by the Rodenhauser family and is under contract to be purchased by Petitioner Freeway Realty, LLC ("Freeway"), a partnership between St. John Properties, Inc. and the Rodenhauser family. The Freeway Property is located at 3900 Church Road, Bowie, Maryland. Although its mailing address is Bowie, it is located outside Bowie's corporate limits, but within one mile of the municipal boundary. The Freeway Property consists of multiple separate parcels totaling 129 acres. It has been used as a general aviation airport since 1947, and its airport use has been a certified nonconforming use[3] under the Prince George's

---

[3] A nonconforming use is a use that predates the adoption of a new zoning ordinance and is inconsistent with it. If a property owner can demonstrate that a use was valid and lawful at the time of the adoption of a new zoning ordinance, the use may be permitted to continue. *Trip Assocs., Inc. v. Mayor & City Council of Balt.*, 392 Md. 563, 573 (2006). The Regional District Act ("RDA") expressly authorizes Prince George's County and Montgomery County to recognize the continuation of "lawful nonconforming use[s] that existed on the effective date of a zoning law enacted" within the Regional District. LU § 22-114. Although the continuation of nonconforming uses is not favored (and local ordinances are strictly construed in order to effectuate the purpose of eliminating nonconforming uses), such uses are nevertheless "'a vested right entitled to constitutional protection.'" *Trip Assocs., Inc.*, 392 Md. at 573–74 (quoting *Amereihn v. Kotras*, 194 Md. 591, 601 (1950)).

4

County Zoning Ordinance since 1968. In the 1960's, a power company that owns an adjacent property installed high-tension lines along the entire western boundary of the Freeway Property. The Freeway Property's northern boundary runs along U.S. Route 50, and its eastern boundary runs along Church Road, which is a county road.

Before April 1, 2022, the Freeway Property was classified in the R-A Zone under what I refer to as the Old Zoning Ordinance. As part of the enactment of a New Zoning Ordinance and a comprehensive rezoning, the Freeway Property was rezoned to the Agricultural-Residential ("AR") Zone effective April 1, 2022. Under both the former R-A Zone and the successor AR Zone, the Freeway Property can be developed as a matter of right for single-family residences on two-acre lots.

It is undisputed that the Freeway Property fit the criteria contained within CB 17-2019, and therefore could be developed with townhouses at a maximum density of 4.5 dwelling units per acre—a use and density that were not permitted in the R-A Zone prior to the enactment of CB 17-2019, and which are not permitted in the successor AR Zone.

### D.    The Parties' Contentions

Respondent Concerned Citizens of Prince George's County ("Concerned Citizens") argues that the text amendment violates the uniformity requirement because it is "site-specific" and applies only to the Freeway Property. Concerned Citizens contends that the criteria are "painstakingly specific" to the Freeway Property. In determining whether the text amendment violates the uniformity requirement, Concerned Citizens urges the Court to look not simply at the text of the criteria, but to consider the text within the broader context of the legislative record in this case, including contemporaneous statements by the

5

Bill sponsor, the Bill's drafter, and a member of the District Council who opposed the Bill, and the various iterations of the Bill that were proposed over the course of seven months. Concerned Citizens contends that the legislative record in this case confirms that the criteria of the text amendment were drafted in a manner to ensure that only the Freeway Property would be eligible for townhouse uses. Concerned Citizens asserts that the text amendment was discriminatory and site-specific to the Freeway Property, giving it favorable treatment over other similarly situated properties.

Freeway argues that the text amendment does not violate the uniformity requirement because "identical terminology . . . applies to all present and future properties in the R-A Zone, including all other properties that potentially qualify under the criteria set forth" in the text amendment. Or, stated another way, Freeway asserts that the text amendment applies "to any eligible R-A zoned property within Prince George's County." Freeway points out that, under the uniformity case law, the question is whether the zoning classification "uniformly applies to all qualifying properties using the same exact terminology or whether a property is singled out for discriminatory treatment."

### E. Summary of Conclusions

The Majority assumes that the Council "intended to reach only the Freeway airport and believed it would be the only property to ever qualify under, and take advantage of," CB 17-2019. Maj. Slip Op. at 33. Under the Majority's theory, the District Council's action in deliberately targeting the Freeway Property for favorable treatment satisfies the uniformity requirement under state law because the Majority believes that the text amendment did not discriminate between similarly situated properties. *Id.* at 41 ("Here,

6

CB [17-2019] discriminates between properties, but Concerned Citizens has not shown that CB [17-2019] discriminates between *similarly situated* properties."). Although the Majority alludes to "similarly situated properties," neither the Majority, nor Freeway identify any. Moreover, an independent review of the record reflects that there are no similarly situated properties.[4]

For the reasons set forth more fully herein, I agree with Concerned Citizens that CB 17-2019 violated the uniformity requirement because "by the terms of the legislation[,]" it singles out the Freeway Property "for disparate treatment[.]" *Anderson House*, 402 Md. at 720. This is a rare case where zoning text that uses ostensibly facially neutral language was not, in fact, generally applicable because its criteria were pretextual. Together, the criteria serve no purpose other than to identify an individual property. In short, the text was drafted in a manner to ensure that it would apply only to Freeway Property, thereby singling it out. As I will detail below, the Majority embraces the clear and unmistakable effort on the part of the Bill sponsor to draft a text amendment that purported to have general application, but in fact, singled out a specific property for favorable treatment.

---

[4] The Majority contends that I am incorrectly shifting the burden to the District Council and, by extension, to Freeway. Maj. Slip Op. at 41 n.30. I am not. My review of the legislative record in this case confirms Concerned Citizens' contention that no one— including the Prince George's County Planning Board—could identify *any other property* that satisfied the criteria, aside from the Hidden Pond parcel, which was excluded by final legislative amendments after the public hearing closed. Freeway argued to this Court that the amendment applies to other similarly situated properties. That argument is not borne out by the record.

7

Under our case law, as well as the case law from other states, when faced with a uniformity challenge, courts generally interpret the ordinance in question utilizing the same principles employed when analyzing equal protection claims. In the context of equal protection claims, facial neutrality is not dispositive. I would consider the ordinance's text and also its context in the broader legislative rezoning process that was ongoing in Prince George's County when the text amendment was being considered, as well as the legislative record, including contemporary statements by the Bill sponsor as he proposed various iterations of the Bill.

Starting with the text, the criteria are tailor-made to describe the unique characteristics of the Freeway Property. The Freeway Property falls within CB 17-2019's size and location criteria. Other criteria identify the uses being made of the adjacent properties. Although the text amendment uses facially neutral language, its unique set of combined criteria do not *in fact* apply to "similarly situated properties," and single out the Freeway Property for disparate treatment. In other words, the legislation was drafted in a manner to ensure that only one property could satisfy the criteria despite the general language utilized by the District Council, in violation of the uniformity requirement.

This is confirmed by the broader legislative rezoning. As discussed in more detail herein, six months prior to the District Council's consideration of CB 17-2019, it adopted a new zoning ordinance which does not permit townhouse uses in the AR Zone that succeeded the R-A Zone. The new zoning ordinance was expected to become effective upon the completion of a district-wide comprehensive rezoning, which was ongoing when CB 17-2019 came before the District Council. At the time, the Council was aware that the

8

text amendment permitting townhouse uses would have a very limited shelf life. In other words, the District Council knew the text amendment would not have prospective application to "similarly situated properties" beyond the period necessary to complete the ongoing comprehensive rezoning. Although the Majority acknowledges that the Old Zoning Ordinance was being phased out, it makes no attempt to explain *how* a text amendment to an old zoning ordinance—that was enacted *after the adoption of a new and inconsistent zoning ordinance*—could possibly apply to any property other than the Freeway Property. In other words, it did not have *any prospective application* beyond the Freeway Property.

Additionally, the legislative record in this case—including the contemporaneous statements of the Bill sponsor, Bill drafter and a District Councilmember who opposed the legislation, as well as the various iterations of the Bill itself—clearly demonstrate that the criteria were drafted in a pretextual manner to suggest that the text *might* have general application, but in fact, when read in their aggregate, would apply only to one property— the Freeway Property. Although the Majority purports to review the legislative record, and pays lip service to the notion that, without such a review, "legislators could circumvent the uniformity requirement with clever drafting[,]" Maj. Slip Op. at 32, that is precisely what occurred here. The Majority condones the conduct that it purports to disavow by refusing to grapple with the pretextual nature of CB 17-2019. As I set forth in more detail below, the legislative record in this case contains a robust discussion among the decisionmakers that reflects a clear and unmistakable intent to draft criteria that would apply only to the Freeway Property.

9

CB 17-2019 singled out the Freeway Property for favorable treatment in violation of the uniformity requirement. The effect of the text amendment was to permit townhouse uses on only one property within the R-A Zone, which is now the AR Zone under the New Zoning Ordinance. The text amendment was the functional equivalent of an illegal spot zoning of a particular property—the creation of a "mini-district" comprised of the Freeway Property in the R-A Zone—enabling that lone property to be developed for townhouses. Accordingly, I would hold that CB 17-2019 violated the uniformity requirement of the enabling statute and is therefore *ultra vires* and invalid.

## II.

### Planning and Zoning Laws—Some Background

Before turning to the uniformity analysis, it is useful to provide an overview of the planning and zoning tools that the General Assembly has provided to the District Council. If our case law teaches us anything in the area of zoning law, it is that zoning and planning concepts are nuanced and difficult to discuss in a vacuum. Zoning opinions tend to be lengthy for a reason—it is necessary to understand the interrelationship between different zoning tools and the reasons behind them—to consider their correct application. Unfortunately for the reader, this dissenting opinion is no exception

### A. *The Maryland-Washington Regional District Act*

In November 1970, the citizens of Prince George's County adopted a charter form of government pursuant to Article XI-A of the Constitution of Maryland. *Prince George's County v. Thurston*, 479 Md. 575, 579 (2022). The legislative branch of the County government—the Prince George's County Council—is comprised of eleven members, nine

10

of whom are elected from geographic districts and two of whom serve as at-large members. Prince George's County Charter, Art. III §§ 301, 304.

Like all charter counties in Maryland, Prince George's County has been given planning and zoning authority by the General Assembly. Prince George's County's zoning authority primarily emanates from the Maryland-Washington Regional District Act ("RDA"), which is currently codified in Division II of the Land Use Article of the Maryland Code. *Zimmer*, 444 Md. at 523–24. "The RDA is the essential source of the delegation by the State of zoning authority to Prince George's County for the areas of Prince George's County within the Regional District." *Id.* at 524–25 (footnote omitted).

The RDA "regulates planning and zoning" within the Maryland-Washington Regional District ("Regional District"), which includes most of Prince George's County and Montgomery County.[5] In *Zimmer*, we described the statutory delegation of planning and zoning authority within the Regional District as follows:

> [T]he RDA divides broadly authority related to zoning, planning, and other land use matters between the county (district) councils, the Maryland-National Capital Park & Planning Commission, and the county planning boards.
>
> The district councils for Prince George's County and Montgomery County consist of their respective county councils. LU §§ 22-101, 14-101. They have primary legislative authority. The district councils are authorized to adopt and amend zoning ordinances and the accompanying zoning maps for their counties, LU §§ 22-104, 22-201, and to develop processes and procedures to ensure that development complies with zoning requirements, *see, e.g.*, LU §§ 20-503(a), 22-214(e). They have a role also in the creation of plans by establishing procedures for the planning process, *see* LU § 21-208(a), and approving master plans for their counties, *see* LU § 21-212.

---

[5] The Regional District encompasses "the entire area of Prince George's County, except for the City of Laurel as it existed on July 1, 2013." LU § 20-101(b).

11

> Moreover, the district councils may delegate certain responsibilities and authority to other local governmental units or tribunals, subject to limitations as may appear in the RDA.

444 Md. at 525–26 (footnote omitted).

The Maryland-National Capital Park and Planning Commission is an agency of the State that is comprised of a total of ten members—five of whom are residents of Montgomery County and five of whom are residents of Prince George's County. LU §§ 15-101–15-102. The commission members from each county are designated as "the Montgomery County Planning Board or the Prince George's County Planning Board, respectively." LU § 20-201; *see also* LU § 14-101(b)–(c). The county planning board "is responsible for the planning, subdivision, and zoning functions that are primarily local in scope[.]" LU § 20-202(a)(1)(i). It has "exclusive jurisdiction over: (i) local functions, including: 1. the administration of subdivision regulations; [and] 2. the preparation and adoption of recommendations to the district council with respect to zoning map amendments[.]" LU § 20-202(b)(1)(i).

The district council for each jurisdiction has legislative authority to adopt and amend zoning laws and zoning maps for the portion of the Regional District located within their respective counties. LU § 22-104(a). The RDA also establishes procedures for the amendment of zoning laws and zoning maps, which I discuss in more detail *infra.* The land use tools and procedures established in the RDA are not unique to the counties comprising the Regional District. To the contrary, the zoning tools established in the RDA have been around since the establishment of the first zoning laws in this country, and have universal application, not only in Maryland, but in our sister states.

12

### B. *Local Land Use Tools—Planning, Zoning, and Subdivision*

Generally speaking, there are three integral parts of land use management: (1) planning; (2) zoning; and (3) subdivision regulation.[6] In *Wesley Chapel Bluemount Association v. Baltimore County*, this Court described these distinct, but complementary components, as follows:

> Governmental control over land development is effected principally in three ways—through the adoption of (1) master plans delineating the desired uses for all land within the planning area, both for development and for roads, parks, schools, and other public purposes, (2) zoning regulations designed to implement the master plans by placing legal restrictions on the use of land by non-governmental persons and entities, and (3) subdivision and other development regulations designed to ensure that private development of the land is consistent with the applicable master plan and zoning regulations. Although each of these devices has an independent purpose and may be subjected to a separate development and approval procedure, their functions, to some extent, coalesce, in that they are all designed to assure that land development occurs in a manner that is consistent with overall legislative policy and community welfare.

347 Md. 125, 129 (1997) (citing generally *Bd. of County Comm'rs v. Gaster*, 285 Md. 233 (1979)). The General Assembly has adopted various enabling statutes that authorize local governments to enact local legislation to carry out each of these functions.

### 1. *Planning Authority*

The enabling statutes that govern the planning functions for most counties are found primarily in LU §§ 1-401–1-418 and §§ 3-101–3-304, *et. seq.* Under these statutes, counties and municipal corporations having planning and zoning authority are required to adopt a "comprehensive plan." LU §§ 1-405, 3-101. "Plans are developed to guide the

---

[6] I mention subdivision regulations simply to identify the three components of land use planning. Because subdivision is not involved in this case, I do not discuss it further.

13

implementation of land use controls and zoning in a rational way that is beneficial to the public." *Zimmer*, 444 Md. at 520 (citations omitted). A comprehensive plan generally applies to a substantial area and is the product of years of study and public input. *Id.* at 520–21. The preparation of a comprehensive plan is undertaken by the planning commission of the local jurisdiction and presented to the local legislature for adoption. *See* LU §§ 1-406(a), 1-415(b), 3-102(a), 3-202(a). The legislative body is required to adopt a comprehensive plan by legislative act. *See* LU §§ 1-415(b), 3-202(a). The county is charged with ensuring the implementation of the comprehensive plan through zoning, subdivision, and other land use regulations. *See* LU §§ 1-415(b), 3-303(b).

The process for creating a plan within the Regional District is slightly different than elsewhere in the State. *Zimmer*, 444 Md. at 521. Specifically, under the RDA, "two types of plans are required: (1) a 'general plan' containing, at a minimum, recommendations for development in the respective county and supporting analysis; and, (2) 'area master plans' pertaining to local planning areas into which each county is divided." *Id.* at 521–22. "The[] plans are prepared by the Maryland-National Capital Park & Planning Commission (which is composed of separate planning boards for each county; the two boards sit together on bi-county issues and separately on matters that pertain purely to its respective county) and must be approved by the local legislature of the respective county." *Id.* at 522 (citing LU §§ 14-101(b), 14-101(f), 21-202, 21-208(a)).

The purpose of the general plan is to:

> (1) guide and accomplish a coordinated, comprehensive, adjusted, and systematic development of the regional district; (2) coordinate and adjust the development of the regional district with the public and private

14

development of other parts of the State and of the District of Columbia; and (3) protect and promote the public health, safety, and welfare.

LU § 21-101(b). "Master plans differ from General Plans in that master plans govern a specific, smaller portion of the County and are often more detailed in their recommendations than the countywide General Plan as to that same area." *Maryland-Nat'l Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 89 (2009) (cleaned up).

### 2. *Euclidean Zoning Principles Generally*

Whereas planning concepts are more abstract, zoning concepts are concrete. Euclidean zoning has its roots in the Standard State Zoning Enabling Act, which was written in the 1920's. *See Zimmer*, 444 Md. at 512 n.14; 1 Arden H. Rathkopf, *et al.*, *Rathkopf's The Law of Zoning and Planning* § 1:3 (4th ed. rev. 2023) (hereinafter *Rathkopf's*). Its name is derived from the Supreme Court case, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926), that upheld a basic zoning ordinance. *Zimmer*, 444 Md. at 511 n.13. "Euclidean zoning is a fairly static and rigid form of zoning[.]" *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 534 (2002). The General Assembly enacted Maryland's first local zoning enabling statute in 1927. *Zimmer*, 444 Md. at 507 (citing Ch. 705, 1927 Md. Laws).[7]

---

[7] The statute authorized Baltimore City and other municipalities with more than 10,000 inhabitants to enact zoning regulations. *County Council of Prince George's County v. Zimmer Dev. Co.*, 444 Md. 490, 507 (2015) (citing Ch. 705, 1927 Md. Laws). Since then, the General Assembly has delegated zoning powers to charter and non-charter counties and municipalities. *Id.* (citing LU §§ 4-102, 22-104).

15

Euclidean zoning has been described as "a legislative method or device for controlling land use by establishing zoning districts with set boundaries and providing for specific regulations as to type or nature of permitted and prohibited land uses, height of structures, lot sizes and restrictions, building coverage limitations and similar regulations." Stanley D. Abrams, *Guide to Maryland Zoning Decisions* § 1.01 n.1 (5th ed. LexisNexis 2012 & 2022 Cum. Supp.). Euclidean zoning regulations are legislatively established in the *text* of the zoning ordinance, with a corresponding zoning *map* that identifies the particular areas to which the zoning laws apply. *Id.*

### 3. *Enabling Statutes Governing the Text of Zoning Laws*

Maryland counties and municipalities with planning and zoning authority have the authority to adopt zoning laws within their territorial boundaries. *See* LU §§ 4-102, 22-104. For that portion of Prince George's County that is located within the Regional District, the General Assembly has given the District Council the authority to "adopt and amend the text of the zoning law[s]" by local law. LU § 22-104(a)(1). The local zoning laws may regulate, among other things, the location, height, bulk, and size of buildings and structures on property, the size of lots, and the density and distribution of population. LU § 22-104(b). The District Council's authority to enact Euclidean zoning laws within separate zoning districts is set forth in LU § 22-201, which states as follows:

(a) *In general.* — A district council may divide the portion of the regional district located within its county into districts and zones of any number, shape, or area it may determine.

(b) *Zoning laws.* — (1) Within the districts and zones, the district council may regulate the construction, alteration, and uses of buildings and structures and the uses of land, including surface, subsurface, and air rights.

16

(2) (i) *Zoning laws shall be uniform for each class or kind of development throughout a district or zone.*

(ii) The zoning laws in one district or zone may differ from those in other districts or zones.

(Emphasis added). The language described above is "commonly referred to as the 'uniformity requirement' of Euclidean zoning" and "has its roots in the Standard State Zoning Enabling Act, which states, at § 2, that applicable zoning 'regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts.'" *Anderson House*, 402 Md. at 713 (footnote omitted) (quoting 1 Robert M. Anderson, *American Law of Zoning 3d* § 5.25 at 417 (1986)). "This or a similar limitation appears in the state zoning enabling acts of nearly every state." *Id.* (citation omitted). I will return to a discussion of the uniformity requirement, as well as our case law discussing this principle, in part III.A.

*4. Applying Euclidean Zoning to Properties in Maryland*

The above-described enabling statute describes the authority of the local jurisdiction—in this case, Prince George's County—to adopt zoning laws. In Maryland, Euclidean zoning laws are applied to properties located in zoning districts through three primary legislative zoning processes: "(1) original zoning; (2) comprehensive rezoning; and (3) piecemeal rezoning." *Rylyns*, 372 Md. at 532. The fundamental distinction between these zoning processes "is that the first two are purely legislative processes, while piecemeal rezoning is achieved, usually at the request of the property owner[s], through a quasi-judicial process leading to a legislative act." *Id.* (citations omitted).

17

a.     Original and Comprehensive Rezoning

As noted above, "the act of zoning either may be original or comprehensive (covering a large area and ordinarily initiated by local government) or piecemeal (covering individual parcels, lots, or assemblages, and ordinarily initiated by the property owner)." *Rylyns*, 372 Md. at 535. For a zoning action to qualify as a comprehensive zoning or rezoning,

> the legislative act of zoning must: 1) cover a substantial area; 2) be the product of careful study and consideration; 3) control and direct the use of land and development according to present and planned future conditions, consistent with the public interest; and, 4) set forth and regulate all permitted land uses in all or substantially all of a given political subdivision, though it need not zone or rezone all of the land in the jurisdiction.

*Id.* (citations omitted). The legislative body's motive or wisdom "in adopting an original or comprehensive zoning enjoy a strong presumption of correctness and validity[.]" *Id.* (citing *Norbeck Vill. Joint Venture v. Montgomery County Council*, 254 Md. 59, 65–66 (1969)). Once zoning is established, it may only be changed "by the adoption of a subsequent comprehensive rezoning, or, in the case of a piecemeal Euclidean zoning application, upon a showing that there was a mistake in the prior original or comprehensive zoning or evidence that there has been a substantial change in the character of the neighborhood since the time the original or comprehensive zoning was put in place." *Id.* at 535–36 (citing *Stratakis v. Beauchamp*, 268 Md. 643, 652–53 (1973); *Anne Arundel County v. Maryland Nat'l Bank*, 32 Md. App. 437, 440 (1976)). "The scope of review by Maryland courts of the legislative decisions embodied in original zonings and comprehensive rezonings is quite narrow." *Zimmer*, 444 Md. at 509 (footnote omitted).

18

Specifically, judicial review is limited to "whether the local zoning authority: (1) followed the appropriate procedure designated by the zoning enabling statute and its own ordinances; (2) comported with the requirements of due process; (3) aimed to achieve a valid public purpose; and (4) did not otherwise exceed its police powers." *Id.* (footnote and citation omitted).

The rigidity of Euclidean zoning, and the presumption of correctness arising from an original or comprehensive rezoning, may feel "unduly harsh to the landowner who finds that planned uses of a property are no longer allowed under the zoning classification into which the land has been placed." *Rylyns*, 372 Md. at 536. In *Rylyns*, we explained:

> The presumption performs, however, and perhaps somewhat ironically, a critically essential function to the benefit of the property owner. Because zoning necessarily impacts the economic uses to which land may be put, and thus impacts the economic return to the property owner, *the requirement that there be uniformity within each zone throughout the district is an important safeguard of the right to fair and equal treatment of the landowners at the hands of the local zoning authority.* Frankly put, *the requirement of uniformity serves to protect the landowner from favoritism towards certain landowners within a zone* by the grant of less onerous restrictions than are applied to others within the same zone elsewhere in the district, and also serves to prevent the use of zoning as a form of leverage by the local government seeking land concession, transfers, or other consideration in return for more favorable treatment.

*Id.* (emphasis added).

In other words, the uniformity requirement protects landowners by ensuring that a neighboring or nearby property will not be used in a manner that is inconsistent with the uses permitted in that zone.

19

b.      Piecemeal Zoning

As noted above, "the original or comprehensive zoning may be changed (unless by a subsequent comprehensive zoning) only by a subsequent piecemeal zoning, which in the case of a Euclidean zone may be granted" by satisfying what is commonly referred to as the "change-mistake rule." *Rylyns*, 372 Md. at 538 (citations omitted).

The "change-mistake rule" is an either/or rule. *Id.* To establish the "change" side of the equation for a piecemeal zoning, "there must be a satisfactory showing that there has been a significant and unanticipated change in a relatively well-defined area (the 'neighborhood') surrounding the property in question since its original or last comprehensive rezoning, whichever occurred most recently." *Id.* The "mistake" side of the rule "requires a showing that the underlying assumptions or premises relied upon by the legislative body during the immediately preceding original or comprehensive rezoning were incorrect." *Id.* at 538–39. Stated another way, "there must be a showing of mistake of fact[,]" not a mistake of judgment. *Id.* at 539.

In addition, even where the standard for change or mistake has been satisfied, "there is no reciprocal right to a change in zoning, nor is there a threshold evidentiary standard which when met compels a rezoning." *Rylyns*, 372 Md. at 539. Where strong evidence exists to support a determination of change or mistake, "piecemeal zoning may by granted, but it is not required to be granted, except where a failure to do so would deprive the owner of all economically viable use of the property." *Id.* (citations omitted). "In Maryland, the change-mistake rule applies to all piecemeal zoning applications involving Euclidean zones[.]" *Id.*; *see also Hardesty v. Dunphy*, 259 Md. 718, 720, 725–26 (1970) (reversing

20

a zoning board's grant of an application to rezone properties in an agricultural-residential area for commercial use because there was no "legally sufficient change or mistake" and therefore a comprehensive rezoning was the only method available for the rezoning). "The change-mistake rule does not apply . . . to changes in zoning made in a comprehensive rezoning[.]" *Rylyns*, 372 Md. at 539.

Piecemeal rezonings are quasi-judicial in nature and are "reviewed most frequently under the substantial evidence test." *Zimmer*, 444 Md. at 510 (citation omitted). In Prince George's County, "[a] contested application for a map amendment . . . may not be granted or denied without written findings of material facts and conclusions." LU § 25-204. "All witnesses appearing in a hearing before the [D]istrict [C]ouncil are subject to cross-examination." LU § 25-203.[8]

---

[8] For the sake of completeness, I briefly mention two other types of zoning—contract zoning and conditional zoning, neither of which are applicable in this case. Contract zoning "occurs when an agreement is entered between the ultimate zoning authority and the zoning applicant/property owner which purports to determine contractually how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 547 (2002). In the absence of "valid legislative authorization, it is impermissible because it allows a property owner to obtain a special privilege not available to others, disrupts the comprehensive nature of the zoning plan, and, most importantly, impermissibly derogates the exercise of the municipality's powers." *Id.* (cleaned up). Conditional zoning is permitted in Prince George's County pursuant to LU § 22-214(a), which allows the placement of conditions on the grant of piecemeal zoning of a subject property, in a manner that may be more limited or restricted than the standards that are generally applicable to all land zoned similarly in the district. "Although conditional zoning introduces flexibility" as far as the zoning authority's ability to place limitations or restrictions on the property, it "does not obviate the necessity for the zoning authority to make the underlying legislative findings required for the grant" of the rezoning, *i.e.,* a determination that the change-mistake rule has been satisfied in the case of a piecemeal zoning application. *Zimmer*, 444 Md. at 519.

21

c.      Spot Zoning

"Spot zoning occurs when a small area in a district is placed in a different zoning classification than the surrounding property." *Tennison v. Shomette*, 38 Md. App. 1, 8 (1977) (citation omitted); *see also* 3 *Rathkopf's* § 41:1 (stating that illegal spot zoning claims "arise when a tract of land is upzoned to allow a higher density or more intensive use or development").

In *Cassell v. Mayor & City Council of Baltimore*, this Court described spot zoning in connection with a challenge to a city ordinance which created a separate commercial district consisting of a single property to permit that property to be used for a funeral home. 195 Md. 348, 352 (1950). Prior to the enactment of the ordinance, the property had been zoned in a residential district, and would continue to be surrounded by residentially zoned properties. *See id.* at 353. We concluded that the rezoning constituted an illegal spot zoning and invalidated the ordinance. *Id.* at 357–58.

We explained that "[t]he State Zoning Enabling Act demands that all zoning regulations shall be uniform for each class or kind of buildings throughout each district," and that "[i]nvidious distinctions and discriminations in zoning cannot be allowed, for the very essence of zoning is territorial division according to the character of the land and the buildings, their peculiar suitability for particular uses, and uniformity of use within the use district." *Id.* at 354 (citations omitted). This Court described "spot zoning" as follows:

> "Spot zoning," the *arbitrary* and *unreasonable* devotion of a small area within a zoning district to a use which is inconsistent with the use to which the rest of the district is restricted, has appeared in many cities in America as the result of pressure put upon councilmen to pass amendments to zoning ordinances solely for the benefit of private interests. . . . It is, therefore,

22

universally held that a "spot zoning" ordinance, which *singles out a parcel of land within the limits of a use district and marks it off into a separate district* for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, *is invalid if it is not in accordance with the comprehensive zoning plan and is merely for private gain*.

On the other hand, it has been decided that a use permitted in a small area, which is not inconsistent with the use to which the larger surrounding area is restricted, although it may be different from that use, is not "spot zoning" when it does not conflict with the comprehensive plan but is in harmony with an orderly growth of a new use for property in the locality. The courts have accordingly upheld the creation of small districts within a residential district for use of grocery stores, . . . and even gasoline filling stations, for the accommodation and convenience of the residents of the residential district.

*Cassell*, 195 Md. at 355–56 (emphasis added) (citations omitted).

The Court held that the ordinance, which reclassified a single lot to allow a use that was not permitted in the surrounding residential district, was "an arbitrary and unreasonable discrimination for the reason that it d[id] not operate alike on all persons residing in the residential area." *Id.* at 358. This Court concluded that the ordinance was "beyond the statutory power of the City Council" and declared it to be invalid. *Id.*; *see also Hewitt v. County Comm'rs of Balt. County*, 220 Md. 48, 52, 64 (1959) (holding that the County Commissioners' action rezoning two residentially improved lots totaling 19 acres from a residential-use classification to a commercial-use classification constituted "invalid 'spot zoning'" because it was "an arbitrary and unreasonable devotion of a small area to a use inconsistent with the uses to which the rest of the district [was] restricted, made for the sole benefit of the private interests of the owner and not in accordance with [the] comprehensive plan").

*5.* *Land Use Tools that Provide Relief and Flexibility from Euclidean Zoning*

To address the tension between the "stability and predictability of Euclidean zoning[,]" on the one hand and its "undesirable rigidity" on the other, Maryland, like our sister states, has created zoning tools—special exceptions,[9] variances,[10] floating zones,[11]

---

[9] "The terms 'special exception' and 'conditional use' are essentially interchangeable." *People's Counsel for Balt. County v. Loyola Coll. in Md.*, 406 Md. 54, 71 n.19 (2008) (citations omitted). Special exception uses are identified by the legislative body as uses that are "conditionally compatible in [a] zone," but not permitted "unless specific statutory standards . . . are met" to ensure that the use on a particular property is compatible with the surrounding neighborhood. *Rylyns*, 372 Md. at 541. These uses are specifically identified as "special exception" uses in a zoning ordinance and are considered to be "a middle ground between permitted and prohibited uses." *Zimmer*, 444 Md. at 513 n.17. Stated another way, special exception uses are "*prima facie* compatible for a given zone, subject to a case-by-case evaluation to determine whether the use would result in an adverse effect on the neighborhood (other than any adverse effect inherent in that use within the zone), such that would make the use actually incompatible." *Id.* (citation omitted). "Because special exceptions are legislatively-created within the comprehensive zoning regulatory scheme, they enjoy the presumption of correctness[.]" *Rylyns*, 372 Md. at 542 (citation omitted). Accordingly, the application for a special exception is not required to make any showing of a change or mistake. *Id.* at 543.

[10] "'A variance refers to administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance (i.e., setback, area and height limitations, etc.).'" *Rylyns*, 372 Md. at 537 (quoting Stanley D. Abrams, *Guide to Maryland Zoning Decisions* § 11.1 (3d ed. Michie 1992)); *see also* 3 *Rathkopf's* § 58:1 ("A variance is the right to use or to build on land in a way prohibited by strict application of a zoning ordinance. It is permission given to a property owner to depart from the applicable zoning requirements by constructing or maintaining a building or structure, or establishing or maintaining a use of land that otherwise would not be allowed."). "Although different jurisdictions use slightly different standards for granting a variance, there is a common purpose behind allowing variances: The variance is a means of correcting occasional inequities that may be created under general Euclidean zoning ordinances." *Md. Reclamation Assocs., Inc. v. Harford County*, 468 Md. 339, 402 (2020) (footnote omitted).

[11] A floating zone allows the local zoning authority to establish in its zoning ordinance "a specific zoning classification for a specific purpose or a class of purposes, but

and overlay zones[12]—that provide flexibility or relief from the rigidity of Euclidean zoning in certain circumstances. *Zimmer*, 444 Md. at 513–14 (footnotes omitted) (citations omitted). In this case, the District Council did not employ any of these tools as part of its effort to introduce townhouse uses within the R-A Zone. For this reason, it is unnecessary to discuss them further other than to point out that: (1) none of these zoning procedures requires the application of the change-mistake rule; (2) each of them involves the filing of an application for a specifically identifiable property or properties; and (3) the approval process for each involves a quasi-judicial proceeding, with findings of fact that must be made by the approving authority prior to granting the application.

---

[] not assign on the zoning map the classification to any property[.]" *Zimmer*, 444 Md. at 515 (citation omitted). This type of zone is said "to 'float' above the local jurisdiction to which the zone may be applied through the grant of a piecemeal zoning map amendment[.]" *Id.* at 516 (citations omitted). "To rezone a property to a floating zone, the zoning authority must find generally that the legislative prerequisites for the zone are met and the rezoning is compatible with the surrounding neighborhood (much as required to grant a special exception)." *Id.* (citations omitted).

[12] An overlay zone "has been described as a mapped district superimposed on one or more established zoning districts, which may be used to impose supplemental restrictions on uses in these districts, permit uses otherwise disallowed, or implement some form of density bonus or incentive zoning program." *City of Hyattsville v. Prince George's County Council*, 254 Md. App. 1, 45 (2022) (cleaned up). "A property located in an overlay zone is simultaneously in two zones, both the overlay zone and the underlying zone." *Id.* (cleaned up). Although overlay zones do not fit within the description of a floating zone (given that they do not float, but are pre-mapped), like floating zones they do not require a showing of change or mistake. *Id.* at 50–52. The rationale for floating zones and overlay zones is the same—the local legislature establishes a detailed process in its zoning ordinance to approve these zones, which include definite, concrete standards, which make the process more akin to the special exception process. *Id.*

25

Having reviewed the nature of Euclidean zoning, and various tools that permit flexibility from the rigidity of Euclidean zoning, I turn to the process that the District Council used here—the adoption of a text amendment that permitted townhouses to be constructed in a Euclidean zone under "certain circumstances" where a property satisfied enumerated criteria.

## III.

## Analysis

It is undisputed that the R-A Zone is a Euclidean zone. The applicable State enabling statute requires that zoning laws enacted by the District Council in traditional Euclidean Zones "*shall be uniform for each class or kind of development throughout a district or zone*." LU § 22-201(b)(2)(i) (emphasis added). If the zoning text amendment violates the "uniformity" requirement of the enabling statute, it is invalid. As previously mentioned, there is little case law discussing the uniformity requirement under the enabling statute. Two of this Court's cases discussing uniformity in detail, *Anderson House, LLC v. Mayor & City Council of Rockville* and *Montgomery County v. Woodward & Lothrop, Inc.*, arose in different contexts than this case. As discussed below, in those cases, landowners challenged the rezoning of their properties as part of a comprehensive rezoning. In connection with the rezoning, the landowners alleged that the zoning regulations that applied to their properties (and which undisputedly had general application within the zoning district) violated the uniformity requirement.

26

### A. Case Law Describing the Uniformity Requirement

In *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 689–92 (1977), ten property owners challenged the rezoning of their properties to a new zoning classification within a newly modified central business district ("CBD"). The Montgomery County Council ("the Council") had adopted zoning text amendments that corresponded to the modifications of the CBD and "regulated the height, area and use of permissible development and thereby sharply reduced the densities and floor area that could be built" in the CBD. *Id.* at 691–92. The development criteria established by the zoning text amendments had been recommended by, and were the product of, a years-long study undertaken by a blue-ribbon committee formed to study development in the area. *Id.* at 694–97. The new zone and development standards were in conformity with the recommendation of the General Plan and a local Master Plan for the planning area. *See id.* at 694. The Council then undertook a sectional map amendment process in which it assigned the new zoning classification to 37 properties. *Id.* at 691–92, 715.

Several of the affected property owners challenged the rezoning and text amendments adopted by the Council, asserting that the sectional map amendment process did not constitute a comprehensive rezoning, and that the associated text amendment violated the uniformity requirement. *Id.* at 692. We determined that the establishment of the modified zone, and its application to 37 identified properties pursuant to the sectional map amendment process, constituted a comprehensive rezoning, and as such, "enjoy[ed] a strong presumption of validity." *Id.* at 706 (citations omitted).

27

The property owners argued that the Council violated the uniformity requirement by adopting zoning regulations for the new CBD that: (1) adopted a computation for parking requirements that was different than for other business districts; (2) permitted properties that were 22,000 square feet or more to be developed at higher densities; (3) vested "complete authority" in the Planning Board to allocate floor area ratio requirements to different parcels; and (4) created a different standard for when property owners were required to conform to the new code for buildings that had use permits prior to 1959. *Id.* at 718–19, 721–22.

This Court rejected the property owners' uniformity challenges. *Id.* at 721–23. We determined that the parking requirements applied to "all property uses" sharing the same characteristics identified in the ordinance. *Id.* at 721. With respect to the minimum size requirement for additional densities, we observed that "[t]he zoning regulations apply uniformly to all parcels less than 22,000 square feet as well as those in excess of that area." *Id.* We determined that the property owners' third challenge, to the Planning Board's authority, was premature. *Id.* at 721–722. Finally, we determined that the differential treatment of nonconforming uses based upon the date that the use commenced was "neither arbitrary nor invidiously discriminatory, but affect[ed] alike all properties similarly situated." *Id.* at 723.

More recently, in *Anderson House, LLC v. Mayor & City Council of Rockville*, this Court engaged in a more in-depth discussion of the uniformity requirement in connection with a landowner's challenge to the rezoning of its property. In that case, the city enacted legislation creating a new commercial transition zone and implemented a comprehensive

rezoning. 402 Md. 689, 696 (2008). As part of a comprehensive map amendment process, the landowner's property was rezoned into the new commercial transition zone, which the landowner contended would deny it the ability to subdivide the property, "and thus preclude additional development." *Id.* at 696, 699.

Like the property owners in *Woodward & Lothrop,* the property owner in *Anderson House* challenged on uniformity grounds the rezoning of the property, as well as the text of the zoning regulations that applied as a result of the rezoning. *Id.* at 701. The landowner's property was rezoned along with approximately 20 other properties as part of a comprehensive rezoning. *Id.* at 699–700, 725 n.27. The landowner's property was the largest property that was subject to the rezoning. *Id.* at 697. The landowner argued that, as a result of the size of the property, the zoning regulations would impact its property in a manner different from smaller properties. *Id.* at 725.

Writing for this Court, Judge Harrell explained the history and rationale of the "uniformity requirement" in Euclidean zoning, which "has its roots in the Standard State Zoning Enabling Act, which states, at § 2, that applicable zoning 'regulations shall be uniform for each class or kind of buildings throughout each district, but the regulations in one district may differ from those in other districts.'" *Anderson House*, 402 Md. at 713 (citing 1 Anderson, *supra*, § 5.25 at 417). The Court noted that "[t]his or a similar limitation appears in the state zoning enabling acts of nearly every state." *Id.* (citation omitted).

We explained that "[t]he apparent motive for including the uniformity requirement in the early days of the introduction of zoning controls was appeasement of potentially

29

hostile landowners." *Id.* (citing 1 Anderson, *supra*, § 5.25 at 418). The Court stated that the uniformity requirement assured property owners "that similarly situated properties would be subject to similar regulation." *Id.* at 713–14 (citation omitted). In other words, we noted, "the uniformity requirement springs less from pure legal necessity, but more from a policy desire to give notice to property owners that ad hoc discriminations will not be tolerated by the law." *Id.* at 714 (citation omitted). We also noted that courts "have been somewhat reluctant to elaborate on or supply judicial gloss to the meaning of the uniformity requirement, perhaps due to the original policy purpose for its inclusion." *Id.* (citation omitted).

Nevertheless, we observed that "[t]rends as to its application . . . appear in a number of states." *Anderson House*, 402 Md. at 714. We stated that "[m]any jurisdictions agree that the kind of discrimination violative of the uniformity requirement occurs when a *zoning ordinance singles out a property or properties for different treatment than others similarly situated*." *Id.* (emphasis added). We undertook an analysis of case law from New Jersey and Connecticut to "provide a useful 'side by side' illustration of the application of the uniformity requirement." *Id.*

We noted that in New Jersey, a court found a violation of the uniformity requirement "when an ordinance imposed a setback requirement of 25 feet throughout a business district[,]" with the exception of a single block in which the regulations imposed a 67-foot setback. *Id.* (citing *N.T. Hegeman Co. v. Mayor & Council of Borough of River Edge*, 6 N.J. Super. 495, 69 A.2d 767 (Law Div. 1949)). On the other hand, the New Jersey Supreme Court found no violation of the uniformity requirement where an ordinance "used

30

a mathematical formula to determine minimum lot sizes and maximum lot coverage based upon the steepness of slopes on properties[,] . . . even though it created varying results based upon a parcel's physical conditions or characteristics." *Id.* (citing *Rumson Estates, Inc. v. Mayor & Council of Borough of Fair Haven*, 177 N.J. 338, 828 A.2d 317 (2003)). That court "emphasized that uniformly applicable regulations could result in different conditions without violating the requirement." *Id.* at 714–715 (citing *Rumson Estates*, 828 A.2d at 329–30). Based upon our review of the New Jersey cases, we explained that "[t]he crux of the [uniformity] requirement is only that similarly situated properties are treated the same under the zoning regulations." *Id.* at 715 (citations omitted).

We also noted that cases from Connecticut recognized the same distinction. For example, we pointed out that the Connecticut Supreme Court held that an ordinance was discriminatory and violated the uniformity requirement where the legislation required a buffer strip for one specific parcel of property, while failing to impose the same requirement on similarly situated properties in the same zone. *Id.* (citing *Veseskis v. Bristol Zoning Comm'n*, 168 Conn. 358, 362 A.2d 538 (1975)). On the other hand, the Connecticut Supreme Court found that an amendment to a town zoning regulation did not violate the uniformity requirement by creating different minimum lot sizes within a particular zone depending on various factors such as lot slope, and whether and the extent to which a property was covered by wetlands or watercourses. *Id.* (citing *Harris v. Zoning Comm'n of Town of New Milford*, 259 Conn. 402, 788 A.2d 1239 (2002)). In this latter case, *Harris*, the Connecticut Supreme Court distinguished the first case, *Veseskis*, by noting that "the regulation in *Veseskis* affected only one specific parcel of land," where in *Harris*, the

31

amendment to the regulation had general application within the zoning district. *Id.* (citing *Harris*, 788 A.2d at 1258). The court in *Harris* stated that "'the thrust of the statutory requirement of uniformity is equal treatment' and concluded that 'the fact that the amendment has [a] differing effect on parcels of land throughout the town does not render its application inconsistent or unequal' because it is applied to 'every parcel within its purview consistently and equally.'" *Id.* (quoting *Harris*, 788 A.2d at 1258) (alteration in original).

After reviewing the case law from these two states, we stated that "Maryland's common law conforms to the trend." *Anderson House*, 402 Md. at 716. We noted that "[a]s with other states, Maryland's limited case law on the uniformity requirement demonstrates that *it is discrimination in favor of, or against, particular properties that will not be tolerated.* In contrast, uniformly applicable regulations that produce disparate results in application do not violate the uniformity requirement." *Id.* at 717 (emphasis added). We proceeded to contrast two Maryland cases that had considered challenges to zoning regulations based on the uniformity requirement—*Board of County Commissioners of Washington County v. H. Manny Holtz, Inc.*, 65 Md. App. 574 (1985), and *Woodward & Lothrop*, 280 Md. 686. We observed that in *Manny Holtz*, the Appellate Court of Maryland "found a violation of the uniformity requirement where a particular property was limited to half of the uses ordinarily allowed in the zone." *Id.* at 717 (citing *Manny Holtz*, 65 Md. App. at 576–77). "Specifically, the Holtz property was rezoned from residential to business." *Id.* (citing *Manny Holtz*, 65 Md. App. at 576–77). During the rezoning process, in an effort to appease certain protestors, the county limited the uses that could be

established on the Holtz property. *Id.* (citing *Manny Holtz*, 65 Md. App. at 577). In other words, the property was "singled-out and treated differently by the terms of the . . . reclassification." *Id.* We noted that the Appellate Court "aptly found that such a limitation would create a 'mini-district' within the relevant business zoning district[,]" and correctly concluded that permitting the county to limit or restrict the uses in the zone "'would have the power to destroy the uniformity of the district'" and "'emasculate' the requirement." *Id.* (quoting *Manny Holtz*, 65 Md. App. at 583) (additional citations omitted).[13]

We contrasted the text amendment at issue in *Manny Holtz* with the text amendment associated with the zoning regulations that were challenged by the property owners in

---

[13] The Majority attempts to distinguish this case from two Maryland cases where legislative enactments improperly singled out properties for different treatment—*Board of County Commissioners of Washington County v. H. Manny Holtz*, 65 Md. App. 574 (1985) and *Cassel v. Mayor & City Council of Baltimore*, 195 Md. 348 (1950). The Majority asserts that, in *Manny Holtz* and *Cassel*, the zoning actions "*reduced* uniformity" whereas in the action here, the text amendment "could be seen as *increasing* uniformity by encouraging an out-of-place airport to redevelop as housing in a largely residential area." Maj. Slip Op. at 27–28. The Majority is mistaken. It loses sight of the fact that *residential development is already permitted* on the Freeway Property. In other words, Freeway did not need a text amendment to enable the property's use as an airport to be discontinued and to allow it to be developed at the same residential density generally applicable in the zone.

In both *Manny Holtz* and *Cassel,* the Appellate Court and this Court invalidated the zoning legislation in question because it singled out the properties for different treatment. As we explained in *Anderson House*, in both cases the property in question "was singled-out and treated differently by the terms of the act of reclassification[,]" thereby "'destroy[ing] the uniformity of the district[.]'" *Anderson House, LLC v. Mayor & City Council of Rockville*, 402 Md. 689, 717 (2008) (quoting *Manny Holtz*, 65 Md. App. at 583) (citing *Cassel*, 195 Md. at 354) (additional citations omitted); *see id.* at 717–18 ("'The regulations for the use of property within the various use districts *are supported upon the basic theory that they apply equally and uniformly . . . . Invidious distinctions and discriminations in zoning cannot be allowed . . . .*'" (emphasis added) (quoting *Cassel*, 195 Md. at 354)).

33

*Woodward & Lothrop. Anderson House*, 402 Md. at 718. In the latter case, we explained that "this Court found that no violation of the uniformity requirement occurred when properties within a zoning district were subjected to uniformly applicable regulations that created in application disparate results for individual properties." *Id.* We explained that "regulations concerning a zoning district that are uniformly applicable may result in application in varying restrictions for individual properties without violating the uniformity requirement. 'This difference in treatment is neither arbitrary nor invidiously discriminatory, but affects alike all properties similarly situated.'" *Id.* at 718–19 (quoting *Woodward & Lothrop*, 280 Md. at 723).

Applying the above uniformity principles to the facts at issue in *Anderson House*, we noted that, like *Woodward & Lothrop*, the ordinance established "uniformly applicable regulations throughout the [] zoning district." *Anderson House*, 402 Md. at 719. We explained that:

> The Anderson House property is but one property to which the uniform regulations applied and for which the uniform regulations created a unique result. *It was not, according to this record, a property singled out by the terms of the legislation for disparate treatment.* All properties included within the [zoning district] are limited by the terms of the legislation. Although the Anderson House property may have been the largest property in gross lot size [zoned in the district], this does not make it a "mini-district," as in *Manny Holtz*, 65 Md. App. 583–84[ ]. *Thus, on the record before us, we conclude that there was no unfair or unequal treatment, no arbitrary or invidious distinction or discrimination, and, indeed, no emasculation of the uniformity requirement*.

*Id.* at 720 (emphasis added) (citations omitted).

The text amendment at issue here arises in a *very different procedural posture* than the uniformity challenge in *Anderson House* and *Woodward & Lothrop*—a crucial

34

distinction that the Majority opinion completely ignores.  In those cases, the properties of the landowners challenging the zoning text amendments were *rezoned as part of a comprehensive rezoning, and it was undisputed that the language used in the zoning regulations had general application to all the properties in the zone*.  In other words, there was no allegation that the zoning regulations at issue applied only to one property or singled out a particular property for favorable or unfavorable treatment.[14]  Here, Concerned Citizens argues that the text amendment does not have uniform application throughout the R-A Zone.  Instead, it asserts, the text amendment is "site-specific" and applies to only the Freeway Property.

---

[14] In addition to failing to appreciate the very different circumstances presented in the *Woodward & Lothrop* and *Anderson House* cases—both of which involved text amendments having general application that were applied to properties within the context of a comprehensive rezoning—the Majority relies on cases involving zoning principles that have no application here.  For example, the Majority quotes the *dissenting opinion* in *Rylyns*, in which Judge Cathell discusses out-of-state cases involving *conditional zoning*.  Maj. Slip Op. at 37, 41 (citing 372 Md. at 593 (Cathell, J., dissenting)).  Conditional zoning concepts, which I discuss in note 8, *supra*, have no application here.

The Majority also relies upon *MBC Realty, LLC v. Mayor & City Council of Baltimore*, 192 Md. App. 218 (2010).  That case is also inapposite.  The text amendment in that case permitted billboards to be constructed by special exception or conditional use on publicly owned stadia and arenas in a particular zoning district.  *Id.* at 226.  First, as the Majority points out, Maj. Slip Op. at 35, the case did not involve a uniformity challenge and the uniformity requirement was not discussed.  Second, there was no determination that the facially neutral criteria were pretextual, nor was there any argument that the zoning criteria would not have *any* potential prospective application to other similarly situated properties.  *See generally MBC Realty*, 192 Md. 218.  As I explain more fully herein, the criteria in CB 17-2019 were not only pretextual, they also had no general prospective application because they were grafted into an Old Zoning Ordinance that would have *no application* upon the completion of the ongoing comprehensive rezoning.  In other words, under the legislative record presented here, there was no scenario in which the carefully crafted criteria would have general application beyond the Freeway Property.

35

The Majority's opinion cannot be squared with this Court's comprehensive analysis of Maryland case law (as discussed in *Anderson House*) and case law from other states involving uniformity challenges associated with illegal spot zonings and text amendments. *See* 402 Md. at 713–20. Those cases "demonstrate[] that . . . *discrimination in favor of, or against, particular properties . . . will not be tolerated.*" *Id.* at 717 (emphasis added). To satisfy the uniformity requirement, the text of a zoning ordinance must use facially neutral criteria that are not simply pretextual. Where an ordinance does so, it may satisfy the uniformity requirement even if, in practice, it affects only one property or a small number of properties. An ordinance does not use facially neutral or generally applicable criteria, and does not satisfy the uniformity requirement, where it specifically identifies the property or properties to which it applies. This is true whether the ordinance identifies the property on its face (*i.e.*, by address or block or plat), or, as the Majority acknowledges, Maj. Slip Op. at 32, and I discuss further below, through facially neutral but pretextual criteria (*i.e.*, criteria that, together, serve no zoning purpose other than to identify the individual property).

The difference between an ordinance that uses facially neutral criteria and one that uses facially property-specific criteria was explained in *Anderson House* by comparing cases involving uniformity challenges (as discussed above). There, we pointed to New Jersey and Connecticut decisions that upheld zoning requirements that applied based on "the steepness of slopes on properties" and "whether, and how much, of a property is covered by wetlands or watercourses," 402 Md. at 714–15 (citing *Rumson Estates*, 828 A.2d at 329–30; *Harris*, 788 A.2d at 1258), and vacated zoning requirements that applied

36

based on whether a property was located on a specific block or a specific plot of land, *id.* (citing *N.T. Hegeman*, 69 A.2d 767; *Veseskis*, 168 Conn. 358). *See also id.* at 715 n.21 (listing cases from other states that draw the same distinction).[15]

As discussed below, this case involves an ordinance that uses facially neutral but pretextual criteria. Despite the Majority's acknowledgement that facial neutrality is not dispositive, it does not actually engage in an analysis to determine whether the seemingly facially neutral language here is in fact pretextual. By contrast, I would analyze the text amendment as follows.

### B.     *The Facially Neutral Text Is Not Dispositive*

Prior to the enactment of CB 17-2019, townhouses were not permitted in the R-A Zone. The text amendment enacted by CB 17-2019 permitted townhouses to be constructed at a density of up to 4.5 dwelling units per acre in "certain circumstances." Those circumstances are that the townhouses could be constructed "on an assemblage of adjacent properties" that: (1)(a) is no less than 100 acres and no more than 150 acres in size, or (b) "was formerly used as an airport"; (2) is located entirely within one mile of a

---

[15] These cases can also help illustrate how generally applicable criteria can apply only to one property and satisfy the uniformity requirement. Imagine a hypothetical property that is located on the only steep slope in a zoning district. The municipality might reasonably believe that the steep slope demanded heightened construction requirements. If a zoning ordinance stated that such requirements applied to all properties located on slopes in excess of a certain grade, the ordinance would likely satisfy the uniformity requirement even though only one property was subject to the construction requirements. But, if the implementing ordinance stated that the construction requirements applied to the property located at 123 Black Acre Road, the ordinance would not satisfy the uniformity requirement. The fact that the local government had a reasonable motive for implementing different construction requirements could not alone save the property-specific ordinance.

municipal boundary; (3) is located "entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation, transmission, or distribution in connection with providing public utility service in the County by a regulated public utility"; and (4) "has frontage on a public right-of-way classified as a freeway or higher in the Master Plan of Transportation and is maintained by the State Highway Administration."

It is undisputed that Freeway Property satisfies all of the criteria in terms of its size (it is more than 100 acres and less than 150 acres), its location (it is entirely within one mile of a municipal boundary), and the uses of the adjacent properties along its northern and western boundaries (having frontage on a public right-of-way and being "entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation [or] transmission"). In fact, the criteria generally describe the Freeway Property as far as its size, location, and borders.

It is also undisputed that the text of the criteria is facially neutral. In other words, the text, on its face, appears to generally apply to similarly situated properties within the zoning district. Stated another way, the text does not expressly state that only one property in the R-A Zone—the Freeway Property—may be developed for townhouse uses, and similarly situated properties may not be developed for the same use. Obviously, the latter example would violate the uniformity requirement as described in *Anderson House*.

Nevertheless, the facially neutral language of the text may not, *in fact*, satisfy the uniformity requirement of the enabling statute. If the criteria are pretextual and, by their terms, apply to only one property in the R-A Zone—the Freeway Property—in a way that

38

singles it out for favorable disparate treatment, then the Bill violates the uniformity requirement.[16]

I disagree with Freeway's argument that, in determining whether the criteria apply to "similarly situated properties," our inquiry must end with a determination that the text of CB 17-2019 is facially neutral. Such a limited inquiry would enable legislators to perform an end-run around the uniformity requirement by adopting criteria that are facially neutral but, when taken together, are not in fact generally applicable zoning criteria and have no purpose other than to identify one particular property and exclude similarly situated properties, thereby singling out the property for favorable or unfavorable treatment and resulting in an "emasculation of the uniformity requirement." *Anderson House*, 402 Md. at 720 (citations omitted).

As *Rathkopf's* explains, "[d]iffering treatment of lands within a zoning district or of lands similarly situated has given rise to discrimination claims based on the lack of . . . 'uniformity.'" 1 *Rathkopf's* § 4:8. Courts generally interpret the uniformity requirement to prohibit unreasonable discrimination. *Id.* This is the same standard used in equal protection claims. *Id.*[17]

---

[16] As noted above, if criteria are generally applicable and not pretextual, they may still satisfy the uniformity requirement even if in practice they affect only one property or a small number of properties.

[17] In this case, we are concerned with whether the text amendment violated the uniformity requirement under the State enabling statute. Zoning laws may also be subject to constitutional challenges alleging equal protection claims. In *Village of Willowbrook v. Olech*, 528 U.S. 562, 563–65 (2000) (per curiam), the United States Supreme Court held that the Equal Protection Clause gives rise to a cause of action when a plaintiff alleges that

39

In the context of constitutional challenges to ordinances arising under the Equal Protection and Free Exercise Clauses, both of which prohibit different types of discrimination, the United States Supreme Court has stated that "facial neutrality is not determinative." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). In both types of constitutional challenges, the Supreme Court has stated that a court may determine whether a public law was adopted to discriminate unlawfully "from both direct and circumstantial evidence." *Id.* at 540 (citing *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)). "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by the members of the decisionmaking body." *Id.* (citing *Arlington Heights*, 429 U.S. at 267–68). In the context of a challenge to a developer's denial of a rezoning on racial discrimination grounds, the Court also noted that

> [d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.
>
> The legislative or administrative history may [also] be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Arlington Heights*, 429 U.S. at 254, 267–68 (footnote omitted).

---

the government has intentionally and arbitrarily treated an individual differently from others similarly situated, even if it is not alleged that the individual is a member of a vulnerable group or class.

40

To determine whether the text amendment applies to "all present and future properties in the R-A Zone, including, as argued by Freeway, all other properties that potentially qualify under the criteria set forth" in the text amendment, I would consider the broader legislative context in which this text amendment arose, as well as its legislative history. When one considers CB 17-2019 within the legislative context and history presented in this record, it is clear that the text amendment, while appearing to have facially neutral application, did not in fact use generally applicable criteria and instead applied to—and was carefully crafted to apply to—only one property, the Freeway Property.

### C. Broader Legislative Context—Prince George's County's Adoption of a New Zoning Ordinance and Comprehensive Rezoning

During the time when the District Council was considering the text amendment in question, Prince George's County was, as noted above, in a transitional period from the Prince George's County Zoning Ordinance that was in effect at that time (the "Old Zoning Ordinance"), to a new Zoning Ordinance that became effective April 1, 2022 (the "New Zoning Ordinance").

### 1. The Old Zoning Ordinance

a. The Residential-Agricultural ("R-A") Zone

The Old Zoning Ordinance contained 17 classes of residential zones that were organized based upon their intensity of use. Prince George's County Code ("PGCC") § 27-109(a)(1). The R-A Zone was the third least intense residential use. PGCC § 27-109(b)(1). The purposes of the R-A Zone were: "(A) To provide for large-lot one-family detached residential subdivisions, while encouraging the retention of agriculture as

41

a primary land use; (B) To encourage the preservation of trees and open spaces; and (C) To prevent soil erosion and stream valley flooding." PGCC § 27-426(a)(1). The land use table sets forth the uses permitted in the R-A Zone. PGCC § 27-426(b)(1). The maximum density in the R-A Zone was one dwelling unit on a two-acre lot.[18] PGCC § 27-442(h) (Table VII). Prior to the text amendment in question, townhouses were not permitted in the R-A Zone.[19] *Id.*

    b.    <u>The Townhouse ("R-T") Zone</u>

Whereas the purpose of the R-A Zone was to encourage detached single-family residences on large, two-acre lots, the general purpose of the R-T Zone under the Old Zoning Ordinance was "to provide for . . . a variety of dwelling types" including "townhouses and other attached dwellings[.]" PGCC § 27-433(a)(1), (2)(A). The R-T Zone primarily permitted the construction of six townhouses per net acre. *See* PGCC § 27-442(h) (Table VII).

    *2.    The New Zoning Ordinance*

In September 2018, the District Council introduced legislation—CB 13-2018—to adopt a new zoning ordinance. Prince George's County District Council, CB 13-2018 (2018). The purpose of CB 13-2018 was to repeal in its entirety the Old Zoning Ordinance,

---

[18] The land use table permits 0.5 dwelling units per net acre. PGCC § 27-442(h) (Table VII).

[19] The Old Zoning Ordinance defined "Townhouse" as "[o]ne (1) of a group of three (3) or more attached 'Buildings' arranged or designed as 'One-Family Dwellings' which: (A) Are entirely separated from each other by walls extending from the lowest floor to the roof; and (B) Have separate entrances from the outside." PGCC § 27-107.01(240).

Subtitle 27, and to replace it with a new zoning ordinance, to be codified in Subtitle 27 of county code. *Id.* After public hearings, the New Zoning Ordinance was adopted in October 2018. *Id.* In connection with the adoption of the New Zoning Ordinance, the District Council undertook a comprehensive rezoning by a Countywide Sectional Map Amendment ("CMA") process "to apply the appropriate zoning classification within the new Ordinance to each parcel of real property in the County." CB 13-2018. To make sure that the effective date of the New Zoning Ordinance would be consistent with the adoption of the new zoning maps, CB 13-2018 specified that its effective date would be the same date that the District Council approved the CMA. *Id.*

With the adoption of the New Zoning Ordinance, the R-A Zone was redesignated as the Agricultural-Residential ("AR") Zone. *See* 2022 PGCC § 27-4201(d).[20] The purposes of the AR Zone are identical to its predecessor R-A Zone: "[t]o provide for large-lot single-family detached residential subdivisions, while encouraging the retention of agriculture as a primary land use; [] [t]o encourage the preservation of trees and open space; and [] [t]o prevent soil erosion and stream valley flooding." 2022 PGCC § 27-4201(d)(1). The maximum dwelling unit per acre in the AR Zone is also the same as under the previous R-A Zone—a single family residence located on a two-acre lot.[21] 2022 PGCC § 27-4201(d)(2). Townhouses are not permitted in the AR Zone. 2022 PGCC § 27-5101(c).

---

[20] To differentiate New Zoning Ordinance citations from Old Zoning Ordinance citations, I refer to the New Zoning Ordinance with "2022" prior to the acronym "PGCC."

[21] The AR Zone contains the same maximum density/minimum net lot area as the former R-A Zone—0.5 dwelling units per net lot area and the minimum net lot area is two acres. 2022 PGCC § 27-4201(d)(2).

43

3.      *Comprehensive Rezoning of the Parts of Prince George's County Located Within the Regional District*

In July 2019, the District Council initiated the CMA process, which took over two years and involved the rezoning of all Prince George's County properties located within the Regional District. With an undertaking of this magnitude, on July 23, 2019, the District Council enacted resolution CR 27-2019, which adopted certain goals, concepts and guidelines, a public participation program, a project schedule, and a proposed guide to the new zones. Prince George's County District Council, CR 27-2019 (2019).

After two years of public hearings and meetings, the countywide comprehensive rezoning was completed in November 2021 with the District Council's adoption of CR 136-2021.[22] Prince George's County District Council, CR 136-2021 (2021). With the adoption of the CMA, all properties located within Prince George's County that are part of the Regional District were rezoned under the zoning classifications set forth in the New Zoning Ordinance. *See id.* The New Zoning Ordinance and its classifications, as designated on the CMA maps, became effective on April 1, 2022. *Id.*

The unique timing of CB 17-2019's consideration and adoption is notable and speaks volumes on the issue of whether it was intended to have general application to

---

[22] The Maryland General Assembly also enacted legislation to ensure that the District Council's Comprehensive Map Amendment ("CMA") process was transparent and complied with certain ethical requirements. Specifically, on May 31, 2021, the General Assembly enacted H.B. 980, which prohibited the Prince George's County Planning Board from recommending, and the District Council from approving, "any request made by or on behalf of any person for zone intensification that differs substantially from the applicable zoning category or classification recommended in the Proposed Guide to New Zones adopted by the District Council" as part of CR 27-2019. Ch. 429, 2021 Md. Laws.

similarly situated properties in the R-A Zone. It is significant that, while the District Council was considering this amendment to the use table in its Old Zoning Ordinance, it was aware that: (1) properties located in the R-A Zone (including the Freeway Property) would be rezoned to the AR Zone as part of the ongoing comprehensive rezoning; and (2) townhouses were not a permitted use in the AR Zone. In other words, the District Council was aware that the text amendment permitting townhouse uses would have a very limited shelf-life—it would be available to a qualifying property only until the New Zoning Ordinance became effective. It was highly unlikely that any "assemblage of properties" that did not already satisfy CB 17-2019's requirements could have been pulled together in time to take advantage of the townhouse uses before those uses were superseded by the New Zoning Ordinance. The unusual timing of this text amendment, in the context of the ongoing zoning ordinance and map amendment process, belies the notion that the District Council intended it to have general, prospective application to "similarly situated properties." It reflects a significant "[d]eparture[] from the normal procedural sequence[,]" which, in my view, "afford[s] evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. In making its conclusory determination that CB 17-2019 treats similarly situated properties the same, the Majority ignores this highly unusual sequence of events.

Turning to the legislative history contained in this record, I view the events leading up to the enactment of the final legislation, and contemporaneous statements by the Bill sponsor as highly relevant to whether CB 17-2019 was enacted to confer special treatment on the Freeway Property.

45

### D. *The Legislative Record*

### 1. *A General Overview*

The first reading of the initial draft of CB 17-2019 occurred at a District Council meeting on April 30, 2019. The Bill sponsor was Derrick L. Davis, the Councilmember representing District 6. From the first reading of the initial draft of the Bill until the adoption of its final iteration, CB 17-2019 was the subject of discussion at five District Council meetings—a first reading on April 30, 2019; a second reading on July 2, 2019; a public hearing on September 19, 2019; a discussion on October 8, 2019; and a public hearing on November 19, 2019.

During the seven months the Bill was under consideration, it was revised four times. Each draft contained a reference to "DR" with a corresponding number, so that DR-1 reflects "Draft 1," and so on, until the final enacted version, which was identified as DR-4. The various drafts of the Bill were the subject of public hearings and review, except DR-4, which contained revisions that the Bill sponsor proposed *after* the public hearings closed and immediately prior to the final vote.

After the first reading of the Bill, it was referred to the Planning, Housing and Economic Development Committee ("PHEDC").[23] The PHEDC discussed Draft 1 at its meeting on June 6, 2019, and at a hearing held on June 20, 2019.

---

[23] The Planning, Housing and Economic Development Committee ("PHEDC") is a committee comprised of a subset of members of the District Council. At the time that this Bill was being considered by the Committee, the members of the PHEDC were Dannielle M. Glaros, Calvin S. Hawkins, II, Derrick L. Davis, Thomas E. Dernoga, and Jolene Ivey.

The Prince George's County Planning Board also reviewed Draft 1 at its meeting on May 2, 2019, and reviewed Draft 3 at its meeting on November 7, 2019. In each instance, the Planning Board opposed the Bill and provided written comments to the District Council explaining its position. The County's Office of Law provided "legislative comment" on Draft 1 on June 11, 2019, and on Draft 3 on November 13, 2019.

The public hearings and meetings extending over seven months share some common themes. *First*, each public proceeding focused on the Freeway Property. Kim Rodenhauser and the Rodenhauser family attorney, Robert Antonetti, spoke at length about the history of the property's use as an airport, its status as a legal, nonconforming use, the dangers and difficulties of the continued operation of the airport, the fact that it was no longer economically feasible to continue its operation, and the Rodenhauser family's intention to develop the Freeway Property for townhouses under the proposed text amendment.

*Second*, each proceeding was well attended by citizens who resided along Church Road and were concerned about the traffic and development potential of the Freeway Property for townhouse uses. The record contains not only verbal comments (in the allotted three minutes that the citizens were given to comment on this draft legislation), but also considerable written comments in the form of letters and emails.[24]

---

[24] In addition to the comments from the public, the City of Bowie also opposed the amendment. The City of Bowie Planning Director, Joe Meinert, spoke in opposition to the Bill at two proceedings. He noted that the Bowie City Council conducted its own public hearing on CB 17-2019 on June 3, 2019 and voted to recommend an unfavorable vote to the District Council. In a separate letter dated June 11, 2019, the Bowie City Council pointed out that the text amendment would be inconsistent with "the newly created Agricultural Residential (A-R) Zone" and would "disrupt the established pattern of

47

*Third*, as I will describe in more detail below, in the seven months of public proceedings, aside from the Freeway Property, neither the District Council nor the Planning Board identified *any other eligible property* that could satisfy all the criteria in the various iterations of the text amendment. Although members of the public and one councilmember, Councilmember Dernoga, repeatedly questioned whether the text amendment would apply to any property other than the Freeway Property, neither the Bill sponsor nor anyone else on the Planning Board or District Council could identify any other specific properties.[25]

Unable to obtain answers from the Bill sponsor or the Planning Board (which opposed the text amendment), Councilmember Dernoga and a citizen, Michael Bridges, attempted to find other properties that satisfied the criteria by searching PGAtlas, the County's public Geographic Information System ("GIS") web mapping application.[26] As I describe more fully below, the record reflects that, toward the end of the public process,

---

development that has occurred" within the low-density zones along the Church Road corridor. The City Council also observed that the proposed text amendment was not compatible with *either* the Old Zoning Ordinance, which was in the process of being phased out, *or* the New Zoning Ordinance that the District Council adopted in 2018.

[25] At the last public hearing on November 19, 2019, Michael Bridges, a resident of Woodmore Highlands, commented that "[f]or seven months, the Bill sponsors have been going through the torturous exercise of contorting the language to avoid the appearance of spot zoning[,]" and that despite requests for information concerning whether any other properties would satisfy the criteria, the Council had been unable to provide that information.

[26] PGAtlas is a web mapping application maintained by the Maryland-National Capital Park & Planning Commission and Prince George's County. *See PGAtlas*, https://www.pgatlas.com/ (last visited Aug. 17, 2023), *available at* https://perma.cc/P8PC-JV2A. It provides access to Geographic Information System ("GIS") web applications and digital maps, including layers of County GIS data and imagery, such as tax and parcel identifiers, distances, and zoning overlays.

two citizens, Mr. Bridges and James Davis, identified one other property—described as the Hidden Pond parcel—that might fall within the criteria parameters and therefore be eligible for townhouse use. As the Council was getting ready to vote on the final iteration of the draft Bill, and after the public hearing had closed, the Bill sponsor proposed final "clarifying" amendments to make sure that the text amendment would exclude the Hidden Pond parcel—the only other property believed at the time to satisfy CB 17-2019's criteria.

Finally, from the first reading of the initial draft of the Bill until its final enactment, the comments made by and discussion between two Councilmembers—Davis and Dernoga—deserve significant weight in analyzing whether the text amendment provided favorable treatment to the Freeway Property. Their contemporaneous statements are instructive when considering the reasons that the Bill had so many iterations. As the Bill sponsor, Councilmember Davis wholeheartedly supported it, and was the individual who requested the various revisions to the Bill. Councilmember Dernoga opposed the Bill from the outset and continued to be a vocal critic until its final enactment. In addition, these two councilmembers were also members of the PHEDC, and participated in the discussion of the Bill at the PHEDC meetings.

The public dialogue between these two Councilmembers reveals the true legislative intent behind, and effect of, the revisions—adoption of a text amendment that appeared to have general application, but in fact, would permit *only* the Freeway Property to be developed for townhouse uses, instead of requiring that the Freeway Property be rezoned through a comprehensive rezoning process or piecemeal rezoning to a higher-intensity zoning district. As I outline below, it is clear from both the text of the various iterations of

49

the Bill, as well as the legislative record, that the Bill sponsor was attempting to water down the text of the proposed legislation by making the criteria vague enough to appear generally applicable while using unique and carefully tailored criteria to ensure that the Bill would apply to only the Freeway Property.

2. *The Various Iterations of the Legislation and Related Discussions*

a. <u>Draft 1</u>

As noted above, a first reading of Draft 1 of the Bill occurred on April 30, 2019. The stated purpose of the Bill was to permit townhouses to be constructed in the R-A Zone "under certain circumstances" Under Draft 1, townhouses could only be constructed "on an assemblage of land" that: (1) was no more than one hundred forty acres in size; (2) was located within one mile of a municipal boundary; (3) "all or a portion of the land was formerly used as an airport"; *and* (4) had "frontage on a public right-of-way classified as an arterial or higher in the Master Plan of Transportation and [was] maintained by the State Highway Administration." Provided that the property met these conditions, the property could be developed for townhouse uses "pursuant to the density and net lot area requirements of the R-T Zone[.]" Draft 1 also stated that certain regulatory requirements of the R-A Zone (such as density, net lot area, and building height) would not apply. In other words, under Draft 1, a property located in the R-A Zone that satisfied all four of the conditions would be permitted to be developed for townhouses under the R-T Zone requirements of the Old Zoning Ordinance, but without undergoing a rezoning.

After the first reading, Draft 1 was reviewed by the Planning Board, which opposed the Bill because it believed that the Bill was drafted for a specific property—the Freeway

50

Property. In a letter dated May 2, 2019, the Planning Board explained that, although approximately 262 properties would meet three of the four criteria (*i.e.*, less than 140 acres in size, located within one mile of a municipal boundary, and having frontage on a public highway maintained by the State Highway Administration), *only one property*—the Freeway Property—would meet *all* the criteria. The Office of Law shared the same concern, stating that the Bill might be "subject to challenge as it appear[ed] to be drafted for a specific parcel."

In addition to pointing out that the text amendment would only apply to one property, the Planning Board noted that permitting townhouses in the R-A Zone was not consistent with the purposes of that zone and was an inappropriate use in that zoning district. The Planning Board pointed out that "[t]he purposes of the R-A Zone are to provide large lot one-family detached dwellings, while encouraging the retention of agriculture as a primary land use; and to encourage the preservation of trees and open spaces. Permitting townhouses in this zone is not appropriate."

b. Draft 2

i. Discussion of Draft 2 by the PHEDC

At the PHEDC meeting on June 6, 2019, the Bill was put on hold by members of that committee. At the PHEDC meeting on June 20, 2019, the members discussed Draft 2, which had been revised at the direction of the Bill sponsor, Councilmember Davis, in an attempt to address the concerns expressed by the Planning Board and the Office of Law.

Draft 2 did not change two of the four conditions from Draft 1—specifically, that the property be located within one mile of a municipal boundary and have frontage on a

51

public highway maintained by the State Highway Administration (although it changed the language describing the public highway). Draft 2 changed the overall acreage size from being "no more than one hundred forty" acres to "no more than one hundred fifty" acres. And, significantly, Draft 2 removed the condition that "all or a portion of the land was formerly used as an airport[.]" Instead of making specific reference to the airport, Draft 2 substituted a new condition—that the property be located "within 2,500 feet of land used for purposes of electrical generation, transmission, and distribution in connection with providing public utility service in the County by a regulated public utility[.]"

At the outset of the meeting, Councilmember Dernoga noted that Draft 2 appeared to have been "finalized yesterday" and asked whether the Planning Board had an opportunity to comment on it. Ms. Hightower, a member of the Planning Board's staff, responded that the Planning Board had not had an opportunity to review Draft 2.

The PHEDC Chair asked Karen Zavakos, the PHEDC Legislative Officer and the individual who compiled Draft 2, to explain the revisions. Ms. Zavakos explained that "in the interest of expediency," the Bill sponsor, Councilmember Davis, asked her to prepare Draft 2 "in the interest of tempering the concerns raised by the Planning Board[.]" She then provided the following explanation for the changes in Draft 2:

> The "formerly used as an airport" language is stricken and is, there was concern that that *may have been too specific*, and so, therefore, *to make it more facially neutral* and in response to the Planning Board's comments, the new language reads, "is within 2500 feet of land used for"—and I apologize. This is wrong, *but it actually serves as consistent language so that you don't call out Pepco or BGE specifically.* So, what they're saying is basically an electrical generation or transmission plant, but that long language is how it is styled in our Code.

52

> The other change, in addition to trying to temper the concerns, is to change the functional transportation classification designation from arterial to freeway in an attempt to expand it. And then the following changes were in response to [the] Planning Board as to how they would review (inaudible) application as to regulations concerning lot coverage, lot width frontage, building height and making sure that it is all considered in a generally approved detailed site plan and is subject to certain requirements that are set forth in the Code and are consistent.

(Emphasis added). In other words, the Bill drafter's testimony unequivocally reflects that the airport language was struck because it was "too specific." In an attempt make the Bill "more facially neutral," Ms. Zavakos removed the specific reference to the airport and inserted a description of a property adjoining the Freeway Property—the public-utility-company-owned property used for electrical transmission. However, Ms. Zavakos noted that she had used general references to the adjoining property "so that you don't call out Pepco or BGE specifically."

After staff comments and prior to public comment, the Bill sponsor offered the following explanation:

> Draft 2 was something—and, as everyone knows, any piece of legislation I work with I measure very well for a long period of time. This is no short measure and no short order, so the Draft 2 actually took into consideration lots of comments, both by Park and Planning Commission, as well as the County Executive's office, and also the perspectives that we received in the mail. Many of them—*the history on this piece of property and this legislation or this idea, and it is better to call it an idea—I could give a history lesson on it, but I won't*.

(Emphasis added). He then stated that he was "fortunate enough to be involved in the [S]mall Airports Advisory Committee two decades ago, fortunate enough to watch the area develop and also fortunate enough to be in a position to essentially look at new opportunities as they come to us."

53

The PHEDC had received numerous letters in opposition to the initial draft of the bill and several constituents spoke. Most speakers brought up concerns with allowing the Freeway Property to be developed for townhouse uses. There was no discussion of other properties.

At the conclusion of the PHEDC meeting, the Chair asked the Planning Board staff member, Ms. Hightower, how many properties would fall within the criteria set forth in Draft 2. She replied that her office did not "ha[ve] the opportunity to do that research between last night and this morning[,]" but stated that she would provide that information "as soon as possible."

After the public comments, members of the PHEDC continued to discuss Draft 2. Councilmember Dernoga expressed several concerns about the legislation. He pointed out that there was no precedent in the Old Zoning Ordinance for applying the densities and uses that are permitted in the R-T Zone to properties in the R-A Zone. He noted that, instead of expressing a maximum size of the property as being "no more than one hundred fifty" acres, the requirement could be revised to establish a minimum size of "at least" one hundred fifty acres to address any concern that it "could apply to a five-acre property or a ten-acre property." Councilmember Davis then asked staff whether the minimum size requirement could be established after the Bill's introduction. Ms. Zavakos replied that the acreage range was "something that could be considered up to and until the close or after the close of the public hearing on th[e] legislation." Councilmember Davis explained that

the only reason I'm asking . . . is a lot—many times, *we don't do things like that because we are trying not to spot zone*. So, *we don't want to make it so tight that it looks like we're trying one thing.* So, I mean, I was concerned with that.

(Emphasis added). Councilmember Dernoga responded, "Lord knows, we would never spot zone, not this (inaudible) body."

Councilmember Dernoga also asked whether the geographic proximity to land used for transmission lines could be reduced from 2,500 feet to 2,000 feet. Councilmember Dernoga stated that he had measured the distance from the Freeway Property to the transmission-line property using the PGAtlas database, and that, based upon his measurements, the entire Freeway Property was "within 2,000 feet of the power line." Councilmember Dernoga asked whether there would be "any problem with reducing that number[.]" Mr. Davis replied that he "note[d] Mr. Dernoga's request." He then stated "[l]et's make sure we look at it specifically, and if it's something that lessens, then it's possible. If it's acceptable, then we can do it[.]"

By a vote of 3-2, the PHEDC members voted to favorably recommend Draft 2, with amendments to incorporate a minimum acreage size (instead of solely a maximum size) and to apply certain R-T Zone regulations to the townhouse development. Based upon this discussion, Draft 2 was revised to reflect that the "assemblage of land" eligible for townhouse uses must be "no less than one hundred (100) acres and no more than one hundred (150) acres in size[.]"

ii.  Second Reading of Draft 2 and First Public Hearing Before the District Council

Draft 2 with the above-described revision was the subject of a second reading at the District Council meeting on July 2, 2019. Thereafter, on September 10, 2019, the District Council held a public hearing on Draft 2. Once again, all of the public comment was directed toward the fact that the text amendment would permit townhouse uses on the Freeway Property, contrary to the permitted uses in the R-A Zone.[27] The District Council's targeted efforts to draft a text amendment that would only apply to the Freeway Property were not lost on those members of the public who testified in opposition to the Bill.[28]

After the public comments were received, Councilmember Davis and Councilmember Dernoga once again expressed their competing views on the legislation. Councilmember Davis reiterated his belief that the text amendment did not constitute illegal spot zoning. He asked the Chair to refrain from calling for a vote on the Bill because

---

[27] Representatives from the City of Greenbelt and the City of Bowie also made comments in opposition to the draft. Colin Byrd, Councilman from the City of Greenbelt, stated that the Greenbelt City Council voted unanimously to oppose the Bill. Councilman Byrd pointed out that the Bill could be challenged under "spot zoning" case law from the Supreme Court of Maryland. Mr. Meinert, the City of Bowie Planning Director, also spoke in opposition to the Bill, reiterating the City of Bowie's opposition to the legislation.

[28] Milly Hall, a party to this suit, observed that "[t]he Bill's intended purpose was to aid the owner of a specific parcel of 129 acres known as Freeway Airport at Church Road and Route 50." Michael Bridges, a resident of Woodmore Highlands, a residential community on Church Road, stated that the text amendment "seems to bypass the more transparent zone map amendment process." In his view the text amendment was akin to illegal "spot zoning" because the Bill would permit a use on "a small area within a zoning district" that was "inconsistent with the use[s]" permitted in "the rest of the district[.]"

there were "substantive amendments to the Bill" that were being contemplated to address "the legalities" of the Bill "as well as the community input that we've heard today."

Councilmember Dernoga made extensive comments expressing his "concern []" about the process." He explained that he was opposed to site-specific text amendments, and that he shared the view of the "the Park and Planning Staff and the Office of Law that, generally speaking, when this is done, it's spot zoning and is really not proper." Councilmember Dernoga pointed out some of the procedural differences between a text amendment and a rezoning application. He mentioned that, with a text amendment, there are no limitations on *ex parte* communications. He stated that, in a rezoning application, there would be a technical staff report, a description of the properties to be affected, and the application would be considered in the context of a quasi-judicial proceeding that would involve a Zoning Hearing Examiner, sworn witness testimony, and expert testimony, and for which the ultimate decision would need to satisfy legal criteria. Councilmember Dernoga stated that, by contrast, "[t]he only legal criteria basically for a legislative text amendment is that you have the majority of the County Council supporting it." Mr. Dernoga then asked Freeway's attorney, Mr. Antonetti, rhetorically why his client did not "go through the rezoning process[,]" commenting that Freeway "could have started this five, six, seven months ago."

With the Bill being held for further review and revisions, the District Council concluded the public hearing.

iii.     Amendments to Draft 2

At a District Council meeting on October 8, 2019, Councilmember Davis proposed another amendment to Draft 2.  Councilmember Davis explained that the amendment would reinsert the "formerly used as an airport" language back into the text but would express that criterion in the alternative or disjunctive.  Specifically, the first requirement was rewritten to state that an eligible assemblage of properties must be "no less than one hundred (100) acres and no more than one hundred fifty (150) acres in size *or was formerly used as an airport*[.]"  (Emphasis added).

Once again, Councilmember Dernoga asked Councilmember Davis whether the text amendment would apply to any properties other than the Freeway Property, and questioned the necessity of adding a reference to the airport use back into the text.  They had the following exchange:

> MR. DERNOGA: Just for clarification, I'm assuming Park and Planning hasn't had time to review this.  We haven't gotten the memo, so I was looking at the Bill, obviously, before the airport language was put in, and I was trying to ascertain whether there was other sites in the County it might apply to. And some came to mind but then, I mean frankly, the only place it would seem that it might come—I was doing that here on my computer—was off of 214 at the end of Central Avenue because they're within a mile of the City of Bowie.  There may be a power line over there.  It's hard to figure out on the fly.  So it looked like it was either just the airport or no property, and maybe some other properties there, maybe not.  So we're putting in "or an airport."  Is that really needed too?
>
> MR. DAVIS: Yeah.
>
> MR. DERNOGA: Okay.
>
> CHAIR: And what we can request, Mr. Dernoga, is for Park and Planning to review the amendment prior to the public hearing as well.

58

MR. DERNOGA: Yeah, I'm just curious trying to figure out what we're talking about.

The Council then voted 7-1 to incorporate the amendments that were discussed and schedule the matter for a public hearing. Because the amendments were determined to be "substantive amendment[s]," the Chair designated Draft 2 with the approved amendments as Draft 3.

      c.     <u>Draft 3</u>

      i.     Discussion by the Planning Board

The Planning Board considered Draft 3 at its meeting on November 7, 2019. The Planning Board voted to oppose the Bill. The Planning Board maintained its position that the text amendment was drafted for a specific property and that the Board was unable to identify any other properties that would meet the criteria. In its written comments to the District Council, the Planning Board stated:

> The purposes of the R-A Zone are to provide large lot One-Family Detached dwellings, while encouraging the retention of agriculture as a primary land use; and to encourage the preservation of trees and open spaces. Permitting townhouses in this zone is not appropriate. *The Planning Board believes this bill was drafted for a specific property. The Planning Board has been unable to identify all properties meeting the criteria* of footnote 134 because the Planning Department does not have records which list land "formerly used as an airport" and *we cannot determine what is meant by "assemblages of properties."* This language could apply to an infinite number of properties. The Planning Board believes there are four (4) operating airports in the County currently. *One operating airport, Freeway Airport contains land zoned R-A and would meet the criteria* of CB 17-2019 (DR-3) if the airport ceased to operate.

(Emphasis added). In other words, the Planning Board was able to identify only *one property* in its current configuration—the Freeway Property—that satisfied all of the

59

conditions in the text amendment. Instead of adopting a text amendment to permit townhouses on the Freeway Property, the Planning Board recommended that the Freeway Property "go through the Sectional Map or Zoning Map Amendment process to rezone the property to an appropriate zone that would permit townhouses."

Notably, the Planning Board also pointed out that the text amendment was "*contrary to the intent*" *of the newly adopted Zoning Ordinance.* (Emphasis added). The Planning Board stated:

> *Townhouses are prohibited in the Agricultural Residential (AR) Zone, which will replace the R-A Zone.* Permitting townhouses in the AR Zone would contradict the purpose statements for the zone. The [text amendment], if carried forward to the new Zoning Ordinance, would add complexity to the adopted Zoning Ordinance through the incorporation of locational criteria.

(Emphasis added).

ii.    Notable Comments on Draft 3

On November 13, 2019, the County Office of Law conducted its review of Draft 3 and made the following comments:

> The bill appears to be drafted for a specific parcel contained within an R-A zone. R-A zones are meant "to provide large lot One-Family Detached dwellings, while encouraging the retention of agriculture as the primary use of the land."
>
> Townhomes are not "One Family Detached dwellings" and therefore are not permitted in the R-A zone. *However, this bill would permit for Townhomes to be built on this specific parcel of land as only one parcel meets the requirements set forth.*

(Emphasis added). The Office of Law expressed concerns that the text amendment would violate the uniformity requirements of the State enabling statute.

60

Because neither the Planning Board nor the District Council could identify *any other property* other than the Freeway Property that might qualify under the criteria for townhouse development in the R-A Zone, Michael Bridges, a resident of the Woodmore Highlands community on Church Road, conducted a search in PGAtlas. Using the criteria in Draft 3, Mr. Bridges identified one property other than the Freeway Property that might satisfy the criteria—a parcel of approximately 137 acres commonly referred to as the Hidden Pond parcel. Mr. Bridges provided this information to the clerk of the District Council in a written email comment on October 29, 2019 and inquired whether the text amendment would apply to this property if the legislation was enacted.

iii.     District Council Public Hearing on Draft 3

The District Council held a public hearing on Draft 3 on November 19, 2019. Many of the same individuals who previously commented on earlier drafts also presented public comments at the hearing. Like the previous public discussions, the comments all centered around Freeway Property, the development of the airport property for townhouse uses, and the traffic congestion on Church Road.

Other members of the public expressed frustration over the fact that neither the District Council nor the Planning Board had identified other properties to which this text amendment might possibly apply, and the potential consequences of the District Council's attempt to use ostensibly generally applicable criteria. A member of the public, James Davis, the President of the Woodmore Homeowner's Association, pointed out (like Mr. Bridges in his October 29 email to the District Council) that the text amendment *might apply* to the Hidden Pond parcel. Mr. Davis stated that "Woodmore has [a] 138-acre

61

underdeveloped parcel of land just north between it and Route 50 that we refer to as Hidden Pond or the Back 9 parcel that is zoned R-A." He stated that, to the extent that the Bill "would apply to Hidden Pond," the Woodmore Homeowner's Association would object.

d. Draft 4

Notably, *after the public hearing closed*, the Bill sponsor proposed a final amendment, which he characterized as "clarifying and non-substantive." In considering the final amendment, it is important to keep in mind the following events that occurred leading up to the public hearing. *First*, six days earlier, the Office of Law stated in a written memo that "only one parcel meets the requirements" of Draft 3. *Second*, members of the public had identified one additional property—the Hidden Pond parcel—that might satisfy the criteria in Draft 3.

Based upon the Bill sponsor's comments below, there is no doubt that he was aware of these facts when he proposed the final amendment after the public hearing had closed. He stated that at each hearing and committee meeting he was "very attentive to what was said by the people who came to present, and at each opportunity, when [he] heard something that could clarify or something that could be substantially invited into the text amendment process, [he] asked [his] colleagues to support amendments." He then stated:

> I am very comfortable that we are at a place where a non-substantive amendment to clarify one more piece [] may be necessary. *And that piece is the one that describes the parcel of land or sliver that was discussed from the gentleman from Woodmore about Hidden Pond. Now, all of the legal team that has looked at it has said there was really no need for this clarifying amendment to be introduced, but out of an abundance of caution and everyone's understanding of what it is that this allows, I wanted to offer this last clarifying amendment.*

And it essentially, and I'm having it passed out to my colleagues now, i[t] just simply strikes a few words, the word "located" on page two in Footnote 134, and inserts, it's after the word "is" and inserts the word "entirely." And *the reason is that there were debates about whether or not this word "entirely" would eliminate a parcel of land from being considered*. We concluded that it didn't help. It didn't hurt, and so we accepted yet another amendment.

And then, also, we wanted to clarify that, after the word "is," insert "entirely" again, and after the word "land," insert "owned by a regulated public utility." *There was discussion about the power lines, and so this language would essentially define what the parameters are again*. So, this amendment, while we feel it's clarifying and non-substantive, and I can turn to our legal team just to make sure.

(Emphasis added) (cleaned up). The Council then voted to adopt the "clarifying and non-substantive" amendment and proceeded to adopt the final version of the Bill with these revisions—which became Draft 4—by a vote of 7-4. It is clear from the Bill sponsor's comments that the language of the final proposed amendment was intended to tighten the parameters of the Bill's criteria to make sure that the Hidden Pond parcel would be excluded. In other words, the language was inserted to make sure that similarly situated properties would be excluded.[29]

---

[29] In the face of this uncontroverted evidence that the criteria were drafted to ensure that the text amendment would apply to only the Freeway Property, at oral argument, Freeway's counsel mentioned that previous iterations of the Bill would have encompassed 262 properties. Those figures were generated when the criteria included all properties that were *less than* 140 acres in size. As enacted, the acreage requirement was modified to be a *minimum* of 100 acres and a maximum of 150 acres.

Nor is there any other evidence in this record that supports Freeway's contention that the text amendment applies to "similarly situated properties." At the public hearing on November 19, 2019, the Rodenhauser family's counsel, Mr. Antonetti, submitted "Exhibit 6," into the legislative record, titled "Limits of CB-17-2019." The exhibit emphasized that, to qualify for townhouse uses under CB 17-2019, the property had to

The Majority acknowledges the fact that the text of CB 17-2019 was tightened up after the public hearing to eliminate the Hidden Pond parcel from its application. It views this as an ordinary, run-of-the mill amendment to appease citizens' concerns. Maj. Slip Op. at 36. The Majority fails to appreciate the true purpose behind the "clarifying amendment"—to eliminate the only other qualifying property from the carefully crafted pretextual criteria that were made to *appear* to have general application, when, in fact, they applied to only the Freeway Property. The Majority turns a blind eye to the fact that the legislative record in this case does *exactly* what the Majority claims is impermissible—that is, the Majority condones the District Council's use of "clever drafting" to "circumvent the uniformity requirement[.]" Maj. Slip Op. at 32. The Majority makes a conclusory determination that, "[h]ere, CB [17-2019] discriminates between properties, but Concerned Citizens has not shown that CB [17-2019] discriminates between *similarly situated* properties. Concerned Citizens has not identified any actual, or even hypothetical, properties similarly situated to the Freeway Airport that the qualifying criteria of CB [17-

meet "all of the [] criteria." (Emphasis in original, capitalization omitted). The exhibit featured an aerial photograph purporting to identify the area within which the "limits of CB 17-2019" would apply, which included the Freeway Property. The aerial photograph identifies Waterford Estates, a residential development of single family homes. The aerial photograph also identifies the undeveloped portions of the Woodmore and Waterford Estates residential communities as being "not eligible" for townhouse development under the criteria established by CB 17-2019. Freeway's exhibit confirms that the *only* existing assemblage between 100 and 150 acres that meets all of CB 17-2019's criteria is the Freeway Property.

The Planning Department and Office of Law were able to identify only one specific property that satisfied all of the criteria—the Freeway Property. When citizens identified the Woodmore "Hidden Pond" parcel, it was excluded by Councilmember Davis's last-minute amendments.

2019] excluded from higher-density development opportunities." (Footnote omitted). Maj. Slip Op. at 41. The Majority ignores two undisputed facts in this legislative record: first, that the peculiar timing of this text amendment in the context of the recently adopted New Zoning Ordinance means that the text amendment could not even have *conceivable* application to any other "similarly situated properties"; and *second*, the 11th hour "clarifying" amendment ensured that the only other similarly situated property was excluded from the scope of the legislation.

### 3. *Summary of Legislative History*

To summarize, the legislative record and various drafts of the Bill clearly establish the following. Draft 1 was crafted to ensure that the criteria permitting townhouse uses would only apply to one property in the R-A Zone—the Freeway Property. When the Planning Board and the Office of Law pointed out that the Bill singled out a particular property for favorable or different treatment in violation of the uniformity requirement, the Bill sponsor proposed various amendments loosening the criteria's language to give the impression the Bill applied to more than one property. After the Bill's language was modified in Drafts 2 and 3 in a manner that might cause it to apply to another property— the undeveloped Hidden Pond parcel—the Bill sponsor added "clarifying" language to exclude the only other identified property. The legislative record clearly reflects that these "non-substantive" amendments were intended to tighten up the criteria to ensure that they would *only apply to* the Freeway Property.

Reading the language of the Bill's criteria against the legislative record in this case, including the comments by the Bill sponsor and drafter, as well as the various iterations of

the Bill, it is clear that the text of the criteria, while written in generalities, was intended to specifically describe the Freeway Property in terms of its size (no less than 100 acres and no more than 150 acres), location (*entirely* within one mile of a municipal boundary), and the adjacent properties and uses on its northern and western boundaries (having "frontage on a public right-of-way" and being "entirely within 2,500 feet of land owned by a regulated public utility and used for purposes of electrical generation [or] transmission"). That the drafter used general language to describe this property does not somehow transform the text into having general application.

The effect of this text amendment is to permit a single property to be developed for uses, and at densities, that are not permitted elsewhere in the Zone. It creates a "mini-district" consisting of a single property—the Freeway Property—in which townhouses are permitted in the R-A Zone. It enables the Freeway Property to be developed using the R-T Zone standards under the Old Zoning Ordinance while bypassing the comprehensive rezoning process (that was ongoing when this text amendment was being considered) and failing to comply with the piecemeal rezoning requirements (*i.e.*, satisfying the change-mistake rule in connection with a quasi-judicial proceeding). The effect of the text amendment was the same as the illegal spot rezoning that this Court rejected in *Cassell*. It created a "mini-district" consisting of the Freeway Property, which was singled out for favorable treatment.

### E.     *Some Final Thoughts About the Majority Opinion*

I agree with the Majority that it is not the Court's role to determine whether the Freeway Property should continue to be used as an airport, or whether it should be

66

developed at a higher density townhouse use. For example, it would be entirely within the District Council's prerogative to encourage the elimination of nonconforming uses—such as a small airport surrounded by residences—by adopting development standards that permit townhouses or bonus densities on such properties. Those are public policy decisions that the General Assembly has placed squarely within the authority of local governments under the enabling statutes pertaining to zoning. Those statutes provide local governments with a multitude of zoning tools that would allow them to effectuate these public policies. Those tools include: (1) rezoning the parcels as part of a comprehensive rezoning, *see supra*, Part II.B.4.a; (2) establishing a floating zone, *see supra*, at n.11, or an overlay zone, *see supra*, at n.12, that specifically permits bonus densities; (3) adopting a text amendment that permits uses or bonus densities by special exception or conditional use, *see supra*, at n.9; or (4) adopting a text amendment that, in fact, has general application within a particular zone—*even if* they "produce disparate results in [their] application[,]" *Anderson House*, 402 Md. at 717.

In this case, the District Council did not utilize any of the zoning tools established by the Maryland General Assembly to accomplish the goal of permitting townhouse development on the Freeway Property. Indeed, the Majority points out that the Rodenhausers' attorney admitted that his client could have pursued a rezoning, but instead pursued a text amendment because it was faster and more direct. Maj. Slip Op. at 6. The Majority's opinion in this case sanctions in the name of expediency site-specific text amendments, which violate the uniformity requirement, over the zoning tools established by the General Assembly. With the Majority's holding—sanctioning the use of zoning text

67

amendments with nonsensical criteria having no planning purpose aside from targeting a specific property—I have no doubt that we will see future cases involving landowners lobbying their local elected officials to sponsor zoning text amendments (for which there is no prohibition on *ex parte* communications). The local municipalities will of course cite to public policy reasons when enacting the resulting legislation, but the text amendments will contain pretextual criteria to allow a use or density on one property that is different from other similarly situated properties in a Euclidean zone. Such a process will be far easier than utilizing the existing zoning tools established by the General Assembly mentioned above, such as a special exception or overlay zoning process.

I also anticipate that the Majority's uniformity standard could create adverse consequences for landowners. As this Court explained in *Rylyns*, 372 Md. at 536, the uniformity requirement "also serves to prevent the use of zoning as a form of leverage by the local government seeking land concessions, transfers, or other consideration in return for favorable treatment." This protection is jeopardized by the Majority's opinion, which creates significant fairness concerns. This case involves singling out a particular property for *favorable* treatment. Suppose, however, that a local government singles out a particular property for *unfavorable* treatment—by taking *away* uses or permitted densities, for example—on the grounds of public policy? Under the Majority's analysis, such treatment effectively satisfies the uniformity requirement if the legislative body can articulate a valid public purpose for the different treatment. I expect we will see equal protection challenges in the zoning arena given the Majority's hollowing out of the uniformity requirement.

The Majority opinion views CB 17-2019 as "just another ordinance in a long line of exceptions, carveouts, and workarounds to Prince George's County's antiquated zoning ordinance (the Old Zoning Ordinance)." Maj. Slip Op. at 28 n.23. The Majority characterizes the enactment of Prince George's County's New Zoning Ordinance as being "largely motivated by a desire to streamline zoning and do away with such exceptions." *Id.* The Majority's cavalier approach to this State's zoning laws, and its decision to embrace Prince George's County's "workarounds" to them, is unfortunate. Respectfully, it is the General Assembly's prerogative to delegate planning and zoning authority to the local governments. As noted above, local governments do not have inherent powers to enact these laws in any manner they choose. Zoning laws must be enacted pursuant to the State's enabling laws, which are established by the General Assembly, and not by the courts.

Finally, as the Majority opinion points out, Concerned Citizens raised additional legal arguments before the circuit court and the Appellate Court concerning the District Council's enactment of CB 17-2019. *See* Maj. Slip Op. at 14 n.12 & 15 n.13. The Appellate Court reached and entered judgment on only one of the issues raised by Concerned Citizens—the uniformity requirement. The Majority has reversed that judgment. However, rather than remanding this case for the Appellate Court to consider the four other legal arguments that were raised by Concerned Citizens, the Majority chooses to dismiss those arguments out-of-hand with one sentence. Maj. Slip Op. at 44 ("With respect to the issues that Concerned Citizens raised but were not reached by the

69

Appellate Court, our analysis here substantially answers those questions and renders a remand unnecessary." (citation omitted)).

I disagree with the Majority's decision not to remand this case. I highlight two examples of legal issues Concerned Citizens raised but were not decided by the Appellate Court and are not addressed here. *First*, given the Majority's conclusion that the State's uniformity requirement permits a text amendment to single out a particular property for special treatment despite the overwhelming evidence in this record that the zoning criteria were pretextual and had no application beyond the Freeway Property, Concerned Citizens should be permitted to have the Appellate Court determine whether CB 17-2019 was a "special law" in violation of Maryland's Constitution. *Second*, before the Appellate Court, Concerned Citizens also raised the issue of whether CB 17-2019 was properly enacted given the Bill sponsor's 11th hour amendments to the legislation that occurred *after* the public hearing had closed. Concerned Citizens should have the right to pursue the legal arguments that Councilmember Davis's self-described "non-substantive" and "clarifying" amendments, which he distributed to his fellow-Councilmembers *after* the public hearing closed, were, in fact, substantive amendments, and therefore, a hearing was required on those amendments prior to the enactment of CB 17-2019. I see no valid basis for the Majority's cursory conclusion that a "remand [is] unnecessary."

**IV.**

**Conclusion**

In conclusion, I would hold that CB 17-2019 violates the uniformity requirement because it singles out the Freeway Property "for disparate treatment." *Anderson House*,

70

402 Md. at 720. This is borne out by: (1) the text of the criteria contained in the Bill, which carefully tracks unique characteristics of the Freeway Property; (2) the context that CB 17-2019 amended the Old Zoning Ordinance after the adoption of the New Zoning Ordinance but prior to its effective date, thereby ensuring that the text amendment would have a very limited shelf life; and (3) the various drafts of the Bill that were clearly intended to give the appearance of having a more general application, but, in fact, when considered in the aggregate, applied to only the Freeway Property. The legislative record clearly reflects that the criteria were pretextual and designed to target the Freeway Property for preferential treatment. Under the facts of this case, the District Council's enactment of a text amendment that singled out one property in the former R-A Zone to allow townhouse use was arbitrary and discriminatory and ran afoul of the uniformity requirement.

For these reasons, I respectfully dissent.

Chief Justice Fader and Justice Watts have authorized me to state that they join this opinion.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/23a22cn.pdf